**UNITED STATES of America ex rel. Edward DOGGETT, #46985, Appellant,**

v.

**Howard D. YEAGER, Warden.**

**No. 72–1556.**

United States Court of Appeals, Third Circuit.

Submitted Dec. 8, 1972.

Decided Jan. 16, 1973.

---

Edward Doggett, pro se.

Alfred M. Bitting, Asst. Prosecutor, Mt. Holly, N. J., for appellee.

Before VAN DUSEN, GIBBONS and HUNTER, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

This is an appeal from the denial of a petition for a writ of habeas corpus. Appellant Doggett is confined by the State of New Jersey on a sentence following a conviction for bank robbery. At his trial the State's case consisted of pre-trial and trial identification evidence, and oral extrajudicial admissions to police officers the making of which Doggett denied. At his trial, on appeal in the state court and in the petition for habeas corpus relief which resulted in this appeal Doggett claimed that he was denied due process (1) because the trial court failed to take appropriate steps to protect the jury from the possible taint of the prejudicial newspaper publicity during the trial in violation of Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965), Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) and Marshall v. United States, 360 U.S. 310,

79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959) (per curiam), and (2) because the identification evidence both included and was the product of a March, 1968 pretrial confrontation—identification held in violation of the constitutional standards of Wade v. United States, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), and Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). The Appellate Division of the Superior Court of New Jersey rejected this contention. (Per curiam, July 19, 1971) (unpublished). The Supreme Court of New Jersey denied a petition for certification. Thus, state remedies on these issues have been exhausted. The district court, relying on the state court record, without conducting a hearing, denied relief. We reverse.

### The *Sheppard v. Maxwell* issue

Prior to the trial Doggett entered a guilty plea. Later, he was permitted to withdraw that plea and go to trial. That trial took place between September 16, and September 20, 1968 at the county court house of Burlington County, Mount Holly, New Jersey. Mount Holly, a community of 12,713 residents (1970 census), is the county seat of New Jersey's largest but most rural county. The jury was selected and the trial commenced on September 16. On the morning of September 18, the *Burlington County Times* published an article containing a photograph of the Burlington County Sheriff viewing a hole in the ceiling of the detention room of the county courthouse. Under the photograph was the caption:

"A 'BREAK-OUT TRY'?—Sheriff Francis P. Brennan gazes at huge gap in a detention cell ceiling at the county courthouse building to determine if it was an escape try. Three prisoners were in this room when a 5 x 5 foot gap was ripped out yesterday."

Under a headline "Officials Probe Jail Ceiling Hole" a news story read:

"Did three prisoners try a 'break-out' at Mount Holly?

A 5 x 5 foot section of a false ceiling around a ventilating shaft in a detention cell where the three prisoners were lodged awaiting court action was ripped out yesterday afternoon and the debris littered the floor of the third-floor room at the county courthouse.

A chair was covered with dust from the debris and stood just beneath a huge gap made in the ceiling.

'An investigation is being made to determine exactly what happened,' Sheriff Francis P. Brennan said.

He stated that this was either 'an apparent attempt to escape or malicious damage. The results of the investigation will determine what further action will be necessary.'

The three prisoners, brought over from the Burlington County Jail to a detention cell at the end of a small hall to the court where County Judge Alexander C. Wood was sitting, were identified by the sheriff's office, as follows:

Edward W. Doggett, 21, of 515 Penn St., Camden, whose jury trial was slated to begin yesterday. He had pleaded guilty previously, then changed his plea to not guilty on an armed robbery charge. The charge concerns an armed robbery, March 29, of Burlington County Savings & Loan Association, Inc., 309 Warren St. Beverly.

\* \* \* \* \* \*

Doggett was alone in the detention room while the other two were in court. When the pair were returned to the cell the door was closed and the court officer resumed his duty. But, as he stood outside he heard a considerable noise, so looked inside and saw the ceiling section ripped down.

Doggett said 'it fell,' but the other two stood 'mute' the officer told the sheriff. . . ."

Thus, the article disclosed Doggett's prior guilty plea, and strongly suggested that he had attempted an escape. One could hardly imagine a combination of newspaper items more likely to suggest to the jury Doggett's consciousness of guilt.

Doggett's attorney became aware of this newspaper story during the noon recess on September 18 and called it to the attention of the trial court. The trial court then questioned the jurors *en banc* rather than individually in an effort to determine if petitioner had been prejudiced by the publication.[1] Four members of the jury said they had seen the newspaper, but not the picture or the article. Juror No. 3 had read the article.

Juror No. 10 had read something about the occurrence in the detention room in another newspaper, the *Trenton Times*. The trial court did not establish whether or not the *Trenton Times* story made reference not only to the alleged escape attempt but also to the retraction of the guilty plea. Although requested to do so by counsel for Doggett, and by the prosecutor,[2] the trial court did not ask the fourteen jurors whether or not there

1. The trial transcript discloses:

"THE COURT: Ladies and gentlemen of the jury, before we proceed, and I will outline our procedure in a few minutes for the rest of the afternoon, there is one question at this point which the Court is constrained to ask you, and ask you in all frankness. And I have no doubt that I will get a frank answer. Your courtesy and your attention to this case, and the instructions of the Court have been most laudible up to this point.

In connection with my instructions, with respect to the reading or paying any attention to any newspaper publication regarding this case or regarding this defendant, I would like to ask you at this point, collectively, whether any of you saw yesterday's Burlington County Times?

(A show of hands by jurors 1, 3, 5 and 11.)

THE COURT: Did any of you ladies and gentlemen read anything about this case in the Times, or about this defendant?

(There was no indication by the jury.)

THE COURT: There is a negative answer right straight through. Let me get the names of the jurors who saw the Times: Mrs. Rafferty, Juror No. 1; Juror No. 3 Mrs. Farley; Juror No. 5, Mrs. Schlote; and Juror No. 11 Mr. Jarg. Ladies and gentlemen, I ask you individually and collectively whether any of you read anything about this defendant, or this case in yesterday's Times?

JUROR NO. 3: I read it.

THE COURT: You did read something about it?

JUROR NO. 3: But I tried not to pay any attention to it.

THE COURT: Would you say, Mrs. Farley, that you were influenced in any way by what you read?

JUROR NO. 3: No.

THE COURT: Does it make any difference in your ability to hear and judge this case fairly and impartially according to the evidence?

JUROR NO. 3: No.

THE COURT: Juror No. 10, Mr. Stiles.

JUROR NO. 10: I read something in the Trenton Times.

THE COURT: I did not see that. But would that have any influence on you or have any bearing on you to hear and judge this case fairly and impartially according to the evidence?

JUROR NO. 10: None whatsoever.

THE COURT: That is all I wish to know. Thank you very much, indeed, ladies and gentlemen." (Tr. 323–26).

2. The trial transcript discloses:

"THE COURT: What is your thought as to the suggestion that the two jurors in question be excused?

[The Prosecutor]: Well, your Honor, I agree with Mr. Weishoff. I don't know whether that would really cure anything, because I don't know whether any discussion—I think the Court would have to ascertain if the two jurors we are talking about discussed anything with the others and whether that would have any effect upon the remaining jurors. That is the only thought I had in mind.

[Defendant's Attorney]: May I be heard, your Honor?

THE COURT: You may.

[Defendant's Attorney]: I would certainly think, and the Prosecutor brought up an excellent point—I should have brought it up and I am sorry I didn't—but if by some chance either of these jurors has discussed it with the panel, the article they read concerning Doggett, I would say we have no choice but to strike the panel. (T. 334).

*  *  *  *  *

THE COURT: Gentlemen, in view of the very candid answers to the questioning of the jurors, I feel that it has been fully demonstrated that the jurors insofar as they have read anything would not be influenced by it and I think we must accept that, and the motion for mistrial is denied." (Tr. 336)

had been any discussion among themselves of these articles. Motions to excuse jurors No. 3 and No. 10 immediately were denied. A motion for a mistrial was also denied. The jury was not sequestered.

On September 19 Doggett's counsel reported to the trial court that another article similar to that quoted above, except that it omitted reference to his retracted guilty plea, had been published in the September 19 *Burlington County Herald*, and that he had noticed a copy of this newspaper in a luncheonette then being patronized by six or seven of the jurors.[3] On this occasion the trial court refused to examine the jurors. A motion for a mistrial was also denied.[4]

The trial court had been alerted by Doggett's counsel on September 16, before the start of the trial, that an incident had occurred in the detention room which would probably result in newspaper coverage. Counsel at that time had moved, unsuccessfully, for an adjournment.

At the end of the charge the trial court excused jurors No. 3 and 10, indicating that they had not been excused earlier lest a third member, for whatever reason, might in the meantime have been unable to sit. No inquiry was made as to whether any of the jurors who remained had since September 18 read the *Burlington County Times* article, the *Trenton Times* article or the *Burlington County Herald* article. No inquiry was made as to whether there had been any discussion among the jurors of any of the articles.

The record discloses that the trial court did admonish the jurors not to read or pay attention to anything about the case appearing in the newspapers. It also discloses that despite this admonition some jurors, at least, certainly disregarded it.

Thus, we have before us a case in which prior to the commencement of a trial, counsel, anticipating adverse newspaper accounts, requested an adjournment; where during the trial highly prejudicial newspaper accounts did in fact circulate in the small community in which the trial was being held; where it was established that at least two of the unsequestered jurors had read the highly prejudicial newspaper accounts despite an admonition not to do so; where an examination as to whether others had also disregarded the admonition was made *en banc* rather than individually; where no inquiry was made as to whether the two jurors who concededly read

---

3. The page one article was captioned:
   "Fallen Roof Raises Question of Escape." It referred to the fact that Doggett was alone in the detention cell while the two other persons being detained were in court changing their pleas from not guilty to guilty. The newspaper quoted Sheriff Brennan. Counsel for Doggett made the point:
   "And it was my understanding that the Court attendants and the Court personnel and those people connected with the Courts were to refrain from making any statements at all to the newspapers." (Tr. 506–07).
   *See* American Bar Association Project on Standards for Criminal Justice, Standards Relating to Fair Trial and Free Press, 2.3 "Rule of court relating to disclosures by judicial employees." This provision states:
   "It is recommended that a rule of court be adopted in each jurisdiction prohibiting any judicial employee from disclos-

ing, to any unauthorized person, information relating to a pending criminal case that is not a part of the public records of the court and that may tend to interfere with the right of the people or of the defendant to a fair trial."
In New Jersey, sheriffs furnish court attendants for the courts in which criminal trials are held. N.J.Stat.Ann. § 2A:11–32 (1952). The Sheriff's concern with the detention cell was in connection with his duties to the court.

4. The trial transcript discloses:
   "THE COURT: I think the Court cannot assume that the jurors have not conscientiously followed the Court's instructions when the Court instruction was renewed just before we recessed for lunch at five minutes to one.
   Under those circumstances I do not consider it necessary to interrogate the jury further, and I will deny the motion for mistrial at this time." (Tr. 509).

the prejudicial newspaper accounts discussed them with others; where an additional page one prejudicial newspaper account circulated in the same small community in the vicinity of the unsequestered jury; where the court would not even permit inquiry respecting exposure of the jurors to the later newspaper account although the jurors had access to the newspaper in question; and where the defendant's position was at all times after the first newspaper account appeared urged upon the court by timely motions for a mistrial and a continuance.

On appeal the Appellate Division of the Superior Court held that the prejudicial newspaper account problem did not present a due process issue. The district court agreed.

Three distinct issues are presented: (1) the appropriate response of a trial court to the problem of prejudicial publicity; (2) the appropriate standard of review of an appellate court when the court discloses the possibility that prejudicial publicity may have reached the jury; and (3) the proper response of a habeas corpus court if the state trial court has not made an appropriate response and if the state appellate court has not applied an appropriate standard of review.

At the trial level, the trial court was alerted to the possibility that a newspaper account of the incident in the detention cell would be prejudicial and might reach the jury. The defendant requested a continuance. It was denied, and the very prejudice anticipated did occur. Again the defendant requested a continuance. The New Jersey Appellate Division, discussing the trial court's ruling, said:

"A motion for an adjournment is addressed to the sound discretion of the court and its denial will not lead to reversal unless it appears from the record that defendant thereby suffered manifest wrong or injury."

But see American Bar Association Project on Standards for Criminal Justice, Standards Relating to Fair Trial and Free Press (hereinafter Standards), 3.-2(c):

"A motion for . . . continuance shall be granted whenever it is determined that because of the dissemination of potentially prejudicial material, there is a *reasonable likelihood* that in the absence of such relief, a fair trial cannot be had. . . . *A showing of actual prejudice shall not be required.*" (emphasis added).

At the trial level, when it became clear that prejudicial newspaper reports circulated in the vicinity of the jury, the court, instead of examining each juror out of the presence of the others, conducted that examination *en banc*. But *see* Standards, 3.4(a):

"Whenever there is believed to be a significant possibility that individual talesmen will be ineligible to serve because of exposure to potentially prejudicial material, the examination of each juror with respect to his exposure shall take place outside the presence of other chosen and prospective jurors."

*See generally* Coppedge v. United States, 106 U.S.App. 275, 272 F.2d 504, 507–508 (1959), cert. denied, 368 U.S. 855, 82 S. Ct. 92, 7 L.Ed.2d 52 (1961), where the court stated:

"The inquiry made of the jurors by the court concerning their reading of the newspaper articles was not adequate for the protection of the defendant. The court knew which of the regular jurors had read the newspaper articles. No individual inquiry was addressed to these persons as to the possible influence of the articles upon each of them. Only a general and very brief inquiry was made of the jury as a whole. There was even then no admonition that jurors who had read the articles must not reveal their purport to the remaining jurors. It is too much to expect of human nature that a juror would volunteer, in open court, before his fellow jurors, that he

would be influenced in his verdict by a newspaper story of the trial. Not only so, but had one or more of them said they would be so influenced, and especially if they had then explained why, the damage to the defendant would have been spread to the listening other jurors. In view of the nature of the articles the court should have made a careful, individual examination of each of the jurors involved, out of the presence of the remaining jurors, as to the possible effect of the articles."

At the trial level, when it became clear that an additional prejudicial newspaper article to which the jurors had access had circulated in Mount Holly the court denied the defendant's motion that the jurors be examined, *en banc* or otherwise. *But see* Standards, 3.5(f):

> "If it is determined that material disseminated during the trial goes beyond the record on which the case is to be submitted to the jury and raises serious questions of possible prejudice, the court may on its own motion *or shall on motion of either party question each juror*, out of the presence of the others, about his exposure to the material." (emphasis added).

At the trial level jurors No. 3 and No. 10, who had read prejudicial newspaper accounts, were permitted, over the defendant's objection, to continue to sit with the panel through the judge's charge, on their representation that the newspaper accounts would not influence their verdict. *But see* Standards, 3.-4(b):

> "A prospective juror who has been exposed to and remembers reports of highly significant information, such as the existence or contents of a confession, or other incriminating matters that may be inadmissible in evidence, or substantial amounts of inflammatory materials, shall be subject to challenge for cause *without regard to his testimony as to his state of mind.*" (emphasis added).

At the trial level no inquiry was made as to discussions among the jurors about the newspaper articles which two of their number had read. *But see* Standards, 3.4(a):

> "The questioning shall be conducted for the purpose of determining what the prospective juror has read *and heard* about the case. . . ." (emphasis added).

*See* United States v. Kum Seng Seo, 300 F.2d 623 (3d Cir. 1962). On appeal the appellate division conceded that many of the procedures followed by the trial court represented less than what it referred to as better practice. It's ruling respecting the request for a continuance is quoted above. Respecting the mistrial motion it said:

> "Likewise a motion for mistrial should be granted only in those situations which would otherwise result in manifest injustice. . . . Our review of the record . . . convinces us that the challenged rulings of the trial judge did not result in manifest injustice."

It approved the practice of leaving jurors No. 3 and No. 10 on the panel by saying:

> "The constitutional guarantee of a fair trial is satisfied if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."

On the point that jurors No. 3 and No. 10 might have tainted the other jurors by discussion of the articles, it disposed of this issue by the *ipsi dixit*:

> "We consider the possibility of such occurrence to be practically nonexistent."

With deference, since the court's instructions about reading newspaper accounts were disregarded, we can hardly accept that the possibility of such discussions among the jurors is practically nonexistent.

On the point that the court refused to inquire whether the jurors had seen the second newspaper article, the appellate division said:

> "[W]e hold that, based upon the representations made to the court by de-

fendant's counsel, the omission to question the jurors as to whether they had seen the article did not amount to a mistaken exercise of the court's discretion."

Defense counsel had informed the court that the newspaper was in close proximity to seven members of the jury. This, according to the appellate division, was not enough, even though two jurors had already admitted disregarding instructions. What more counsel could have shown, in view of his clear duty not to make any direct contact with the jury outside the courtroom,[5] is not disclosed. Reenforcing its ruling on the failure to examine as to the second newspaper story, the appellate division also said:

"Even were we to hold the omission to be erroneous, our consideration of the proofs convinces us that it was harmless. The evidence linking defendant to the crime was overwhelming."

To accept this harmless error ruling we must accept that the jury did learn from the second newspaper story of an escape attempt by the defendant on the eve of trial, and that this information in no way influenced the result. Leaving aside the serious question whether there is any room for a harmless error rule with respect to inadmissible extrajudicial evidence going to a jury, the "overwhelming" evidence here consisted:

(1) of testimony as to pre-trial one-man lineup held in alleged violation of Wade v. United States, *supra*,

(2) of in-court identification questioned as the product of an unduly suggestive lineup. Stovall v. Denno, *supra*, and

(3) of an oral admission, the making of which Doggett denied.

The defendant was not apprehended near the scene, spatially or temporally. The loot was not recovered. We cannot hold that information about an escape attempt could not have influenced the verdict; certainly we cannot so hold beyond a reasonable doubt. *See* Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

The district court, unfortunately, in its review of the state court record, applied the same legal standards as were applied by the appellate division. Those standards were inconsistent with the due process requirements of the fourteenth amendment.

In effect, both the appellate division and the district court imposed upon the defendant the burden of demonstrating that the newspaper accounts had actually prejudiced the jury against him. Prior to 1959 that may have been the law. *See, e. g.*, Buchalter v. New York, 319 U.S. 427, 63 S.Ct. 1129, 87 L.Ed. 1492 (1943); Holt v. United States, 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021 (1910); Thiede v. Utah, 159 U.S. 510, 16 S.Ct. 62, 40 L.Ed. 237 (1895); Mattox v. United States, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892); Simmons v. United States, 142 U.S. 148, 12 S.Ct. 171, 35 L.Ed. 968 (1891); Hopt v. Utah, 120 U.S. 430, 7 S.Ct. 614, 30 L.Ed. 708 (1887); Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244 (1878). Beginning in 1951, however, with Justice Jackson's concurring opinion, joined in by Justice Frankfurter, in the per curiam reversal in Shepherd v. Florida, 341 U.S. 50, 71 S.Ct. 549, 95 L.Ed. 740 (1951), the Supreme Court began the evolution of a more reasonable due proc-

---

5. *See* ABA, Code of Professional Responsibility and Canons of Judicial Ethics, Disciplinary Rules, DR 7–108(B) "During the trial of a case:
   (1) A lawyer connected therewith shall not communicate with or cause another to communicate with any member of the jury." (Footnote omitted).

This rule is presently in effect in New Jersey by virtue of R. 1:14, Pressler, Current N.J. Court Rules (1972). At the time of Doggett's trial the Canons of Professional Ethics of the American Bar Association were in effect by virtue of N.J. R.R. 1:25. The rule as to contact with jurors was the same. *See* ABA Canons of Professional Ethics No. 23.

ess standard for judging the effect of extrajudicial influences on a jury. In Stroble v. California, 343 U.S. 181, 198, 72 S.Ct. 599, 96 L.Ed. 872 (1952), what was concurrence in *Shepherd* became for Justice Frankfurter dissent from the affirmance by the majority of a decision by the Supreme Court of California announcing a standard of review as to the effect of prejudicial newspaper publicity essentially the same as that applied by the New Jersey courts in this case. Justice Frankfurter dissented not only from the ruling which placed on the appellant the burden of demonstrating that the prejudicial material had influenced the result, but also from the Court's toleration of the role of a court officer, the prosecutor, in encouraging dissemination. *See also* Leviton v. United States, 343 U.S. 946, 72 S.Ct. 860, 96 L.Ed. 1350 (1952) (memorandum of Justice Frankfurter on the denial of certiorari). In 1959 came Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959) (per curiam).

In a departure from its prior rulings the Court granted a new trial despite the statement of the jurors that they would not be influenced by the news articles, that they could decide the case only on the evidence offered and that the articles had engendered no prejudice against the defendant. The case involved two newspaper reports during the trial which contained information of prior convictions of the defendant and his wife. In *Marshall*, contrasted with this case, the examination of the jurors had been conducted separately out of the presence of their fellow panelists. Each of the seven jurors who had seen one or more of the news articles assured the court that he would disregard it in his deliberations. The Court reversed the denial of a motion for a mistrial, saying:

"We have here the exposure of jurors to information of a character which the trial judge ruled was so prejudicial it could not be directly offered as evidence. The prejudice to the defendant is almost certain to be as great when that evidence reaches the jury through news accounts as when it is a part of the prosecution's evidence." 360 U.S. at 312–313, 79 S.Ct. at 1173.

Prior to 1959 the Supreme Court had applied the same standard in prejudicial publicity cases whether the case arose in a federal or in a state court. Marshall v. United States, *supra*, while factually controlling in this case, is distinguishable on the ground that it involved the Supreme Court's supervisory power over a lower federal court rather than its constitutional power to enforce fourteenth amendment due process standards. But soon after 1959 it became clear that the former rule was no longer applicable in state trials. In Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L. Ed.2d 751 (1961), a state habeas corpus case, the Court noted that newspaper publicity had resulted in a pattern of deep and bitter prejudice in the community where the trial was held. It reaffirmed the view announced in *Marshall* that prejudicial infection is not cured by the statement of a juror that he will not be influenced by adverse publicity. It also disapproved of conducting an examination to determine prejudice in the presence of the other veniremen. The Court stated:

"No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but the psychological impact requiring such a declaration before one's fellows is often its father." 366 U.S. at 728, 81 S.Ct. at 1645.

There can be no doubt that Irvin v. Dowd, *supra*, was intended as a change in the prior rule, for instead of citing the older cases set forth hereinabove, it cited with approval the concurring opinion of Justice Jackson, in which Justice Frankfurter had joined, in Shepherd v. Florida, *supra*.

In Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), on certiorari to the Supreme Court of Louisiana, the Court considered

a case in which a motion picture of the defendant "confessing" to the local sheriff was broadcast on television in the parish from which the jury was drawn. Three members of the jury which convicted the defendant admitted on *voir dire* they had seen the television broadcast. Challenges for cause were denied, as was a motion for a change of venue. The Court discussed the participation of law enforcement officials in the generation of the prejudicial publicity, but said:

> "In the view we take of this case, the question of who originally initiated the idea of the televised interview is, in any event, a basically irrelevant detail. For we hold that *it was a denial of due process of law to refuse the request for a change of venue, after the people of Calcasieu Parish had been exposed* repeatedly and in depth to the spectacle of Rideau personally confessing in detail to the crimes with which he was later to be charged." 373 U.S. at 726, 83 S.Ct. at 1419 (emphasis added).

As Justice Clark's dissent in *Rideau* makes clear, that case represents a refinement of Irvin v. Dowd, *supra*. Not only is it no longer necessary that a defendant show that the jury actually was prejudiced, since *Rideau* it is not necessary to show that the prejudicial material actually reached the jury, and thus infected the trial. If the information was prejudicial and the dissemination widespread in the community from which the jury was drawn, the defendant is entitled to relief. In the words of the Court:

> "[W]e do not hesitate to hold, without pausing to examine a particularized transcript of the *voir dire* examination of the members of the jury, that due process of law in this case required a trial before a jury drawn from a community of people who had not seen and heard Rideau's televised 'interview'." 373 U.S. at 727, 83 S.Ct. at 1419.

In Turner v. Louisiana, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965), again over Justice Clark's dissent, the Court held that a defendant need show no more to establish a due process violation than that two prosecution witnesses acted as attendants for the jurors during his trial. No showing that the jury was thereby influenced against him was required. The majority cited Rideau v. Louisiana, *supra*, and Justice Clark cited his dissent in that case. *See* 373 U.S. at 727–733, 83 S.Ct. 1417 (Clark, J., dissenting). In 1965, in Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543, Justice Clark, who approved Irvin v. Dowd, *supra*, but dissented in Rideau v. Louisiana, *supra*, wrote the opinion of the Court reversing the Court of Criminal Appeals of Texas. *Estes* does not involve the possible taint of the jury from outside influences, but the possible taint arising from in-court televising of the proceedings. The State contended that no prejudice had been shown. Justice Clark wrote:

> "The State paints too broadly in this contention, for this Court itself has found instances in which a showing of actual prejudice is not a prerequisite to reversal. This is such a case. It is true that in most cases involving claims of due process deprivations we require a showing of identifiable prejudice to the accused. Nevertheless, at times a procedure employed by the State involves such a probability that prejudice will result that it is deemed inherently lacking in due process.

> \*　　\*　　\*　　\*　　\*　　\*

> This rule was followed in *Rideau, supra,* and in Turner v. Louisiana, 379 U.S. 466 [85 S.Ct. 546, 13 L.Ed.2d 424] (1965). In each of these cases the Court departed from the approach it charted in Stroble v. California, 343 U.S. 181 [72 S.Ct. 599, 96 L.Ed. 872] (1952), and in Irvin v. Dowd, 366 U.S. 717 [81 S.Ct. 1639, 6 L.Ed.2d 751] (1961), where we made a careful examination of the facts in order to determine whether prejudice resulted. In *Rideau* and *Turner* the Court did not stop to consider the actual effect of the practice but struck down the

conviction on the ground the prejudice was inherent in it." 381 U.S. at 542–543, 85 S.Ct. at 1632–1633.

Thus, as of 1965 the rule was firmly established (1) that if a defendant has shown the likelihood that seriously prejudicial materials may have reached the jury, due process requires some form of relief, and (2) that a juror's statement that the adverse publicity will not influence him is not sufficient automatically to qualify him as impartial.

■ Now a convert to the majority position, in 1966 Justice Clark turned again to the pre-trial publicity area in Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). Reiterating that the possibility of prejudice imposes the necessity for some form of relief as a due process requirement, and that the juror's avowal of impartiality is not dispositive, he wrote:

> "From the cases coming here we note that unfair and prejudicial news comment on pending trials has become increasingly prevalent. Due process requires that the accused receive a trial by an impartial jury free from outside influences. Given the pervasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of the jurors, the trial courts must take strong measures to ensure that the balance is never weighed against the accused. *And appellate tribunals have the duty to make an independent evaluation of the circumstances.*" 384 U.S. at 362, 86 S.Ct. at 1522 (emphasis added).

Sheppard v. Maxwell, *supra,* adds to the teaching of the cases on prejudicial publicity decided after 1959 the requirement that appellate tribunals make an independent evaluation of the circumstances. It is not enough for the appellate court, as was done here, to look at the record and conclude that the trial court did not abuse its discretion (1) in refusing to grant a continuance; or (2) in refusing to grant a mistrial; or (3) in refusing to interrogate the jurors separately; or (4) in refusing to interrogate the jurors at all about the second newspaper story; or (5) in refusing to inquire about possible discussions among the jurors. An appellate court must decide for itself whether the measures taken were sufficiently strong to ensure that the balance did not weigh against the accused.

■ The state trial court in ruling on defendant's several motions applied incorrect standards of due process. The Appellate Division of the Superior Court applied incorrect standards of due process. The district court adopted the state courts' incorrect standards. Our independent evaluation of the circumstances surrounding the exposure of the jury to prejudicial publicity convinces us that due process requires that Doggett be afforded a new trial because there was a substantial likelihood that the contents of the newspaper accounts making reference to his retracted guilty plea and to an alleged escape attempt came to the attention of the jurors who deliberated. This conclusion makes unnecessary a determination of Doggett's second ground of appeal, the *Wade-Stovall* issue.

The judgment of the district court will be reversed and the case remanded for the entry of an order that a writ of habeas corpus shall issue unless, within a reasonable time to be fixed by the district court in such order, the State of New Jersey shall afford the appellant a new trial.