Jack Burton TUNNELL

v.

Doris WILEY and Richard A. Sprague.

Civ. A. No. 73–31.

United States District Court,
E. D. Pennsylvania.

Jan. 2, 1974.

University of Pennsylvania Law School Indigent Prisoner Litigation Program by Sherrie Raiken, Philadelphia, Pa., for plaintiff.

Morgan, Lewis & Bockius by John R. McConnell and Christian C. Day, Philadelphia, Pa., for defendant Doris Wiley.

Office of District Attorney, County of Philadelphia by Judith Dean, Philadelphia, Pa., for defendant Sprague.

OPINION AND ORDER

HIGGINBOTHAM, District Judge.

I.

Plaintiff artfully attempts to categorize for adjudication as a constitutional

issue a problem which does not actually exist on the record of this case. From plaintiff's vantage he suggests that he has raised the following issue:

Does he have the right to collect civil damages under the Federal Civil Rights Act (42 U.S.C. § 1983) by reason of pretrial newspaper publicity which could purportedly deprive him of an impartial jury trial in a forthcoming criminal case where he would be a defendant?

Plaintiff attempts to cast this case as if the record establishes that the rights of freedom of the press or freedom of speech have collided with his right to a fair trial. Thus, he urges that because of the purported collision of these competing interests he is entitled to $600,000 in damages from a newspaper reporter and a First Assistant District Attorney. If here we had a factual record which established a collision of these two stellar rights (freedom of the press versus a fair trial), the problem could be more difficult for a court to make a definitive judgment as to which right should prevail in a suit for civil damages. But that hypothetical difficulty does not exist here. Factually, there has been no actual clash between these values, for plaintiff cannot establish that by reason of pretrial newspaper publicity he sustained any impediment to an impartial and fair trial. Thus, in contrast to plaintiff's categorization we have here a record like ships passing in the night without collision or even any substantial probability of colliding.

Jack Burton Tunnell contends that the article published in a Philadelphia newspaper, The Bulletin, on March 19, 1972, was the result of a civil conspiracy between defendants Doris Wiley, a Bulletin reporter, and First Assistant District Attorney for Philadelphia County, Richard A. Sprague, to deprive plaintiff of his right to a fair trial, his right to freedom of access to the Court, and his right to freedom from excessive bail, said rights being guaranteed under the Due Process Clause of the Fourteenth Amendment.

Defendants Doris Wiley and Richard A. Sprague filed Motions to Dismiss the Complaint for failure to state a claim upon which relief can be granted and alternatively motions for summary judgment. Fed.R.Civ.P. 12(b) and 56. In addition, defendant Wiley filed a motion to strike the entire complaint inasmuch as it violated certain procedural rules controlling the form of pleadings. Fed. R.Civ.P. 9(a) and 10(b).

I hold that, as a matter of law, the undisputed facts fail to establish the constitutional deprivations claimed by plaintiff in his complaint; more specifically, I find and hold that the pretrial publicity did not in any way deprive him of a fair trial in his subsequent criminal case. As to all of the issues, defendants are entitled to a motion for summary judgment, and as to some components of plaintiff's claim defendants are also entitled to a motion to dismiss.

## II.

### FACTUAL BACKGROUND

The background of this case starts with plaintiff Tunnell having been convicted and committed to prison on November 22, 1968 on a "homicide"[1] charge for which he received a three to ten year sentence. Prior to the expiration of his minimum three year sentence he was placed into the West Philadelphia community on a "pre-release" program of the State Correctional Institution at Graterford, Pennsylvania (Graterford Prison). While on this pre-release program he was arrested for a brutal attack on two teenagers in West Philadelphia. According to the Philadelphia Bulletin article in issue, while on the pre-release program on November 3, 1971, he ". . . led the boy and girl into a vacant shed after putting a screwdriver to the girl's neck and threatening to stab her with it if either screamed or

---

1. The article in the Bulletin noted "Tunnell was committed to prison on a homicide charge November 22, 1968. He had been sentenced 3 to 10 years."

tried to run away . . . he ordered the girl to undress and forced her to tie up the boy with his belt and blindfold him with her bra. He told them he had 'killed three people' and they would be the fourth and fifth. After sexually assaulting the girl, he burned her with a cigarette in both eyes, then he burned the boy's eyes and asked them both if they could see him. When they answered 'yes' . . . he stabbed them both in the eyes with a screwdriver . . . he set fire to their clothing and walked out the shed."[2] The article further stated plaintiff's name, the location of his residence, and related his history in the program as well as his prior criminal record.

The caption of the article in the Sunday Bulletin states "Officials cite early release in parolee's attack on two youths," with a sub-heading "I burned them in the eyes so they couldn't tell the man who did this." The article further quotes First Assistant District Attorney Richard A. Sprague as saying that it was "idiotic" that Tunnell had been placed on the pre-release program and "let the legislators who passed the laws allowing this, explain it to that boy and girl." He said, "It is outrageous. When is the public going to have enough of this? How many times must people be raped, maimed, murdered . . . before the public demands a halt to it?" Because of the newspaper's publishing of this article and the Assistant District Attorney's comments, plaintiff seeks to obtain $600,000 in damages.

## III.

### PLAINTIFF'S LEGAL THEORY

Plaintiff insists that his claim is not one for defamation and that for his cause of action under 42 U.S.C. § 1983

" . . . the test of actual malice and known falsity is therefore inapplicable." (See Plaintiff's brief, p. 9). Thus plaintiff seeks to avoid having to face in this case the reporter's and Assistant District Attorney's probable defense[3] that the statements published were in fact truthful as to his sexual attack on a teenage girl and his assault, mayhem and brutality on both teenagers. Similarly, he seeks to nullify the First Amendment constitutional guarantee which precludes liability if the statement was not published with "a reckless disregard of whether it was false or not." New York Times Co. v. Sullivan, 376 U.S. 254, 276, 84 S.Ct. 710, 724, 11 L.Ed.2d 686 (1964). See, Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971).

In substance, plaintiff urges that the Assistant District Attorney's comment that Tunnell's act constituted "one of the most atrocious in the crime annals of the city" was so inflammatory that it and other comments on the facts of his case "lessens the likelihood that plaintiff could ever have the fair trial . . . he is entitled under the due process clause of the 14th Amendment." (See Plaintiff's brief, p. 3.) See, Commonwealth of Pennsylvania v. Pierce, 451 Pa. 190, 303 A.2d 209 (1973). The core of plaintiff's theory is that he is entitled to substantial damages because this publicity, even if true or privileged, could preclude him from a fair trial on the criminal charges. *I need not speculate on the hypothesis as to whether the published article could have denied him a fair trial because I find that plaintiff has failed to produce any evidence that the published statements in fact precluded him from obtaining a fair trial when his criminal case was listed thirteen months later.*

2. Plaintiff's complaint, pp. 5–6.

3. A defamatory communication generally need only tend to harm an individual's " . . . reputation as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Restatement of Torts § 559 (1938). In Pennsylvania truth is an absolute defense to an action in libel. Corabi v. Curtis Publishing Company, 441 Pa. 432, 273 A.2d 899 (1971); Schnabel v. Meredith, 378 Pa. 609, 107 A.2d 860 (1954); Matson v. Margiotti, 371 Pa. 188, 88 A.2d 892 (1952); Act of April 11, 1901, P.L. 74, § 2, 12 P.S. § 1582.

After the instant complaint was initiated, Tunnell was tried and convicted on May 4, 1973 on the charges for which he had been arrested sixteen months earlier. In spite of Tunnell's allegation in the present controversy his defense attorney did not request a change of venue for the criminal trial, and Tunnell has presented no evidence here to suggest that his May 4, 1973 trial was adversely affected by the newspaper publicity of March 19, 1972.

## IV.

## ACCESS TO COURTS

Although plaintiff alleges he was denied freedom of access to the Courts,[4] neither his complaint nor his brief alleges facts sufficiently specific to support this claim nor does his brief argue the law on this issue.

A mere allegation of constitutional deprivation without factual support will not withstand a motion to dismiss. Fletcher v. Hook, 446 F.2d 14 (3d Cir. 1971). Of course, the Court construes a *pro se*[5] complaint in a light most favorable to plaintiff. Carr v. Sharp, 454 F.2d 271, 272 (3d Cir. 1972); United States ex rel. Gittlemacker v. County of Philadelphia, 413 F.2d 84 (3d Cir. 1969) cert. denied 396 U.S. 1046, 90 S.Ct. 696, 24 L.Ed.2d 691; Lockhart v. Hoenstine, 411 F.2d 455 (3d Cir. 1969) cert. denied 396 U.S. 941, 90 S.Ct. 378, 24 L.Ed.2d 244. However, even under this relaxed standard there is nothing in

the circumstances related by the complaint to indicate a reasonable basis for granting relief. Negrich v. Hohn, 379 F.2d 213, 215 (3d Cir. 1967).

Therefore, plaintiff's claim against defendants is DISMISSED as to the alleged denial of free access to the courts.

## V.

## THE BAIL ISSUE

On December 30, 1971, Tunnell was arrested and charged with assault, mayhem, and attempted murder; bail was set at $10,000 two days later on January 1, 1972.

Plaintiff alleges that he was unable to raise the $10,000 bail set on January 1, 1972, and that subsequent efforts to have the amount reduced proved unsuccessful. Plaintiff alleges he received a letter from Glenda Garcia, a representative from the Release on Recognizance Program, the agency to which plaintiff had applied for assistance in having his bail reduced, and that Miss Garcia allegedly wrote, "Your case has been widely publicized, and I have been discouraged on all administrative levels from handling your bail application."[6]

The bail was finally reduced to $5,000 on October 25, 1972 but prior to that date plaintiff became subject to a detainer from Graterford Prison lodged against him for violation of the conditions of his pre-release status.

Plaintiff argues that his right to bail was denied because the news arti-

---

4. The Complaint states:
 "(8). Plaintiff states that he has not yet been tried on the case. That he is denied access to the courts for any Pre-Trial Motions. That he has filed eight (8) Pre-Trial Motions and has not been giving [sic] an oppinion [sic] on any. That it has been over a year since his arrest, and a year and a month since the crime.
 "(9). Defendants are collectively guilty of *Malfeasance, Misfeasance*, and *Nonfeasance* of Plaintiff's *humand* [sic] and *Civil rights*. Plaintiff further states that of the eight (8) Pre-Trial Motions, he has not had a hearing on any. And some has [sic] been filed as late as August 27, 1972."
 "(10). The plaintiff states that *PROCEDURAL DUE PROCESS* IS not limited to

criminal proceedings, but is equally applicable to *Civil Proceedings.* U.S.C.A. Amends. 5th, 14th." Complaint p. 4.

5. The complaint was filed on January 19, 1973, and on that same date leave to proceed *in forma pauperis* was granted. On February 2, 1973 most able counsel was appointed from the Prison Research Council of the University of Pennsylvania Law School pursuant to Rule 9½ of the Local Rules of this Court. Plaintiff was therefore represented by counsel in responding to defendant's motions.

6. Plaintiff's Brief, p. 2. This letter was not made a part of the record.

cle prejudicially influenced the authorities making the bail recommendation as well as the court making the bail determination.[7] Plaintiff's claim does not accurately state the constitutional issue, for the Eighth Amendment of the United States Constitution does not secure a right to bail but commands that "Excessive bail shall not be required. . . ." In the context of plaintiff's factual allegation we must interpret his claim as challenging the constitutional appropriateness of the bail amount in light of the surrounding circumstances.

■ First, since bail was set nearly three months *before* the news article in question was published, there is no basis to establish that the article adversely affected the original bail determination in any manner. However, plaintiff contends that his constitutional rights were nevertheless abridged because his subsequent efforts to have bail reduced were prejudiced.

■ This issue in its second aspect must necessarily presuppose that the original bail amount was so excessive initially as to constitute a constitutional deprivation, for otherwise the effect of the article upon the reduction of that initial amount is not a constitutional issue. There were no facts submitted to establish that the original bail amount was excessive as a matter of law outside the allegation that the news article had prejudiced attempts by plaintiff to have bail reduced.

The Court of Appeals for the Eighth Circuit has held that the Eighth Amendment prohibition against requiring excessive bail is regarded as applying to the States. Pilkington v. Circuit Court of Howell County, Missouri, 324 F.2d 45, 46 (8th Cir. 1963) (Per Curiam); *accord*, California v. Alcorcha, 86 S.Ct. 1359, 1361 n. 4, 16 L.Ed.2d 435 (1966); `see`, Goodine v. Griffin, 309 F.Supp. 590 (S.D.Ga.1970).

However, as stated in *Pilkington, supra*:

"It is to be borne in mind, however, that the prohibition is only against requiring excessive bail. It does not afford a basis for one accused of a crime to insist that he is entitled to be released entirely without bail or wholly on his own recognizance. The language of the Amendment is not subject to being construed as providing such a guarantee. A State may properly require bail in some amount, and the mere fact that an accused is unable to furnish it in any sum, and so wants to be released on his own recognizance, does not present a federal question." 324 F.2d at 46.

■ Even assuming that the original bail amount was unconstitutionally excessive it is not reasonable to infer that the news account prejudiced subsequent efforts to have bail reduced. In Stack v. Boyle, 342 U.S. 1, 72 S.Ct. 1, 96 L.Ed. 3 (1951) Chief Justice Vinson cited the then Rule 46(c)[8] of the Federal Rules of Criminal Procedure as setting out the

---

7. Plaintiff also alleges in his complaint that his so-called "right to post bail" was denied because of the detainer lodged against him from Graterford Prison and the alleged reluctance of the State to lift said detainer due to the published article. This allegation suffers from a similar defect as discussed with regard to the freedom of access to the courts claim discussed, *supra*. Consequently, I will not consider the merits of this argument.

It is noteworthy with regard to this assertion that several courts have concluded that there is no *absolute* right to bail under the federal constitution. United States ex rel.

. Fink v. Heyd, 287 F.Supp. 716 (E.D.La. 1968), aff'd. 5 Cir., 408 F.2d 7, cert. denied 396 U.S. 895, 90 S.Ct. 192, 24 L.Ed.2d 172. *See*, Commonwealth v. Fowler, 451 Pa. 505, 304 A.2d 124, 126 (1973). Nonetheless it is clear that issuance of a lawful detainer against plaintiff is an independent state ground upon which his confinement is predicated and which when considered alone does not raise a constitutional issue as to excessive bail.

8. These standards have been somewhat modified and now are set out at 18 U.S.C. § 3146(b) for noncapital offenses.

traditional standards [9] for bail determinations. Under the Rule 46(c) formulation as well as the present 18 U.S.C. § 3146(b) formulation it is entirely proper for bail determinations to be based upon, *inter alia,* the circumstances of the offense charged, the weight of the evidence, the defendant's prior record and other facts bearing upon his character. Since the article in question did not articulate any facts which would be improper for any court to consider in making a bail determination, then it is not logical for this court to infer solely from the fact that such article was published that defendant was deprived of his constitutional rights in this regard.

Similarly the comments of defendant Sprague as expressed in the news article do not violate standards of constitutional due process on the basis of prejudicial influence on bail determinations. Since there is a great deal of prosecutorial discretion in determining whether an arrestee should be indicted, the fact that an indictment was in fact filed against Tunnell is an assertion by the public prosecutor that he believes there to be sufficient evidence to establish the criminal defendant's guilt beyond a reasonable doubt.

A bail hearing is not a trial in which guilt or innocence is adjudicated. There is no jury which must be shielded from inflammatory statements which might cloud their judgment. *Cf.* Wood v. Georgia, 370 U.S. 375, 389, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962). To the contrary, the bail hearing seeks only to bring forth the full panoply of evidence bearing upon the necessary security required to assure the defendant's appearance at trial on an individualized basis and among the evidence appropriate to such inquiry is the opinion of the prosecutor as to the weight of the evidence against the accused.

## VI.

## BALANCING THE RIGHT TO A FAIR TRIAL VERSUS THE RIGHT TO FREEDOM OF PRESS OR FREEDOM OF SPEECH IN 42 U.S.C. § 1983 ACTIONS.

In many respects the plaintiff's theory is one of first impression. Thus, it is essential to analyze what is *not* involved in this case and the different issues involved in those cases on which plaintiff relies.

*First,* this is *not* a habeas corpus case, and accordingly, there may be acts constituting a constitutional deprivation which would entitle a defendant to a new trial or a habeas corpus writ while those same acts would not constitute for defendants the right to civil damages against the person who purportedly caused the constitutional deprivation. As an example, a judge by his rulings or findings might cause a constitutional deprivation which thereby entitles a defendant to a new trial in a criminal case, but that deprivation does not create a basis for a civil damage action against the judge under 42 U.S.C. § 1983. E. g. Johnson v. Alldredge, 488 F.2d 820 (3rd Cir. 1973); Turack v. Guido, 464 F.2d 535 (3rd Cir. 1972). Similarly, a municipality (directly or through its agent) might cause the deprivation of a citizen's constitutional rights, but again the municipality is immune from liability under 42 U.S.C. § 1983. Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); Moor v. County of Alameda, 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973).

These two examples are cited to indicate that despite the great breadth of

---

9. These standards were not held to be of constitutional proportion, although they are doubtlessly constitutional. As stated in the opinion of Mr. Justice Jackson, in which Mr. Justice Frankfurter joined:

"These statutory standards are not challenged as unconstitutional, rather the amounts of bail established for these petitioners are alleged to exceed these standards. We submitted no constitutional questions to argument by the parties, and it is our duty to avoid constitutional issues if possible." 342 U.S. at 9, 72 S.Ct. at 5.

coverage of § 1983, it is still not sufficiently co-extensive with the habeas corpus remedy to reach all constitutional deprivations affecting individual liberty.

I am fully cognizant of the liberality extended defendants in habeas corpus cases. As Judge Gibbons noted in United States ex rel. Doggett v. Yeager, 472 F.2d 229, 238 (3d Cir. 1973):

" . . . Not only is it no longer necessary that a defendant show that the jury actually was prejudiced, since Rideau it is not necessary to show that the prejudicial material actually reached the jury, and thus infected the trial. If the information was prejudicial and the dissemination widespread in the community from which the jury was drawn, the defendant is entitled to relief."

▆▆ Yet I do not read *Doggett, supra,* nor Commonwealth v. Pierce, *supra,* as creating *per se* a civil right for any defendant to collect civil damages in every instance where habeas corpus relief must be granted because of a federal constitutional deprivation under color of state law.

▆▆ Plaintiff's counsel cites extensively the enlightened authors of the American Bar Association project on Standards for Criminal Justice as to their 1968 draft on Standards Relating to Fair Trial and Free Press. While their recommendations require thoughtful evaluation they are merely recommendations and are not constitutional holdings.

▆▆ *Secondly,* we are not here in this § 1983 civil action exercising any supervisory role over law enforcement agencies. The ABA Report makes recommendations relating to the conduct of law enforcement officers, judges, and judicial employees in criminal cases, and in Commonwealth v. Pierce, *supra,* the Pennsylvania Supreme Court acted with commendable enlightenment in setting out guidelines [10] for policemen and members of the staff of the office of District Attorney in Philadelphia as to what should not be released to the news media. While it is appropriate for appellate courts to promulgate such standards in its supervisory power, those standards are not *per se* rights encompassed within 42 U.S.C. § 1983.

▆▆ *Third,* and perhaps most important, it must be noted that in this civil case, since plaintiff seeks civil damages, there is necessarily involved here a balancing process which must also consider the importance of the rights of freedom of press and freedom of speech. Here in this civil case we must weigh factors such as freedom of the press which principles were not assessed in *Doggett, supra,* for there the court never implied that in the habeas corpus case it was evaluating the issue of freedom of the press. Instead, in *Doggett, supra,* and many other habeas corpus cases, the court had the luxury of taking a unilateral view (thinking only of the rights of the criminal defendant) when holding that " . . . it is not necessary to show that the prejudicial material actually reached the jury, and thus infected the trial." United States ex rel. Doggett v. Yeager, 472 F.2d at 238. Here we must have a bilateral vision which requires appreciating the significance of Justice Clark's sage comments in behalf of the Supreme Court in Sheppard v. Maxwell, 384 U.S. 333, 349, 350, 86 S.Ct. 1507, 1515, 16 L.Ed.2d 600 (1966):

"The principle that justice cannot survive behind walls of silence has long been reflected in the 'Anglo-American distrust for secret trials.' In re Oliver, 333 U.S. 257, 268, 68 S. Ct. 499, 92 L.Ed. 682 (1948). A responsible press has always been regarded as the handmaiden of effective judicial administration, especially in the criminal field. Its function in this regard is documented by an impressive record of service over several centuries. The press does not simply

---

10. In considering the opinion in Pierce there is a question of whether those guidelines should be given retroactive application.

publish information about trials but guards against the miscarriage of justice by subjecting the police, prosecutors, and judicial processes to extensive public scrutiny and criticism. This Court has, therefore, been unwilling to place any direct limitations on the freedom traditionally exercised by the news media for '[w]hat transpires in the court room is public property.' Craig v. Harney, 331 U.S. 367, 374, 67 S.Ct. 1249, 1254, 91 L.Ed. 1546 (1947). The 'unqualified prohibitions laid down by the framers were intended to give to liberty of the press * * * the broadest scope that could be countenanced in an orderly society.' Bridges v. State of California, 314 U.S. 252, 265, 62 S.Ct. 190, 195, 86 L.Ed. 192 (1941)."

Only recently, Mr. Justice Brennan re-emphasized our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks." New York Times Co. v. Sullivan, 376 U.S. at 270, 84 S.Ct. at 721.

 In our constellation of values we most often categorize our national commitment for debate on public issues as the right of freedom of press or freedom of speech. Probably no other values were thought by our forefathers to be more paramount than freedom of speech or freedom of press. Yet even those freedoms are not absolute and can be subjected to some restraints. E. g. Beauharnais v. Illinois, 343 U.S. 250, 72 S.Ct. 725, 96 L.Ed. 919 (1952) (Frankfurter, J.); Schenck v. United States, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470 (1919) (Holmes, J.).[11] Yet, there is also another constellar value of our society that each defendant shall always be assured the right to a fair and impartial trial. As Mr. Justice Clark noted in Sheppard v. Maxwell, supra, 384 U.S. at 350, 86 S.Ct. at 1516:

"The Court has insisted that no one be punished for a crime without 'a charge fairly tried in a public tribunal free of prejudice, passion, excitement, and tyrannical power.' Chambers v. State of Florida, 309 U.S. 227, 236–237, 60 S.Ct. 472, 84 L.Ed. 716 (1940)."

 The gravamen of the newspaper articles and the comments of the District Attorney in this case are inextricably related to the issue of the pre-release prison program at Graterford. Many, if not most of our cities have a steadfast and apprehensive concern over violence on our streets, in our homes and throughout the society; thus, no one can suggest that the prisoner pre-release programs are not public issues over which public officials and newspaper reporters should refrain from analyzing. Certainly, the viability, the effectiveness and the safeguards of a prison program which prematurely releases a man convicted of murder constitute a matter of "public or general concern." Cf. Rosenbloom v. Metromedia, Inc., supra.

In Doggett, supra, Judge Gibbons concluded:

"Thus, as of 1965 the rule was firmly established (1) that if a defendant has shown the likelihood that seriously prejudicial materials may have reached the jury, due process requires some form of relief, and (2) that a juror's statement that the adverse publicity will not influence him is not sufficient automatically to qualify him as impartial." 472 F.2d at 239.

Plaintiff here does not assert that any of the jurors in his trial had read the news article, nor does he contend that any of them had learned of any statements contained in the article from other sources. Plaintiff is relying solely upon what he characterizes as the inherently prejudicial nature of the article and the fact that its publication was as-

---

11. See generally, Lockhart, Kamisar & Choper, Constitutional Law, Chapter 12, 883–894 (1970) and Thomas I. Emerson, Toward a General Theory of The First Amendment, 72 Yale L.J. 877 (1963).

sisted by the First Assistant District Attorney, Richard A. Sprague.

The crucial question here is whether under the test of *Doggett, supra,* there is a sufficient likelihood that seriously prejudicial materials reached the jury. I conclude that the facts construed in a light most favorable to the plaintiff do not establish as a matter of law such a sufficient likelihood to establish a deprivation of constitutional rights.

The court in *Doggett, supra,* relied primarily upon the opinion of Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963) in holding that an identifiable prejudice need not necessarily be demonstrated in order to find a lack of due process because of pretrial publicity. However, in *Doggett, supra,* the transcript of petitioner's trial disclosed that several of jurors had been exposed to and several other jurors had read news accounts which charged petitioner with attempting to escape from the courthouse detention cell. The article also disclosed petitioner's previous guilty plea which had been subsequently withdrawn. The article was published during trial and several jurors admitted having read the account. Even though the individual jurors disclaimed any influence after an in court *voir dire* by the trial judge the Court of Appeals held that the exposure of these jurors to the article was sufficiently prejudicial to overcome such disclaimers and that a new trial should be granted.

In *Rideau, supra,* the defendant appealed from the denial of his motion for a change of venue where an in custody film interview in which the sheriff elicited an oral confession from defendant was televised. The court concluded that the film had an audience of some 24,000 persons the first day of its broadcast, some 53,000 persons the second, and some 20,000 the next day in the community of 150,000 from which the jurors were selected. Three members of the jury which convicted Rideau admitted having seen and heard the televised interview. The Court did not examine the transcript of the *voir dire* examination but held that these circumstances were inherently prejudicial and presented a sufficient probability of actual prejudice to warrant a new trial with a corresponding change of venue.

The opinion of Sheppard v. Maxwell, *supra,* relates a situation of continuous news accounts of an inflammatory and prejudicial nature saturating the community from the occurrence of the crime in July, 1954, through December, 1954, when Sheppard was finally convicted. In any event there were many other material elements involved in the decision of that case which are not present here and which also affected the Court's decision.

In Irvin v. Dowd, 366 U.S. 717, 727, 728, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) the Court found that due to intensive publicity ninety per cent of the jurors examined on *voir dire* entertained some opinion of guilt and that the ten member panel chosen was never questioned as to whether they held an opinion of the case. The Court held that a denial of defendant's motion for a change of venue under those circumstances violated the standards of Fourteenth Amendment Due Process.

Plaintiff's counsel has ingeniously excerpted doctrines announced in other cases to weave a theory of liability in the instant matter. However, when deciding on the transferability of doctrines previously espoused, there is imposed upon this Court the correlative responsibility to ascertain whether the theories stated in other cases are controlling or are even relevant in the present different factual milieu. For all legal abstractions ultimately derive their substance from the factual circumstances in which they are bred.

 My rather detailed discussion of the facts in *Doggett, Pierce, Rideau, Sheppard,* and *Irvin, supra,* is an attempt to demonstrate their factual dissimilarity to the instant case. As I evaluate their relevant doctrinal implications to the instant matter in a 42 U.S. C. § 1983 proceeding, I find that the plaintiff at the very least must establish

that the members of the jury in fact were exposed to the contents of the prejudicial publicity in question or that there is a substantial likelihood that they were exposed to the contents of such publicity. A finding of substantial likelihood of such exposure may be made upon a showing that, *inter alia*, in light of the size of the community in which publicity was communicated and from which the jurors were drawn and considering the intensity and timing of such publicity in relation to the time of trial the probabilities are substantial that some jurors have been adversely influenced.

In the case at bar the plaintiff was the subject of but one news article published in one Philadelphia newspaper albeit one of relatively large circulation. The article was published more than a year before trial. The plaintiff did not request a change of venue. Also, the plaintiff's attorney was given an opportunity to question the prospective jurors individually with regard to their knowledge of the case through pretrial publicity, but no evidence was submitted indicating that any jurors were challenged on this basis.

By reason of the ultimate holding made here, perhaps it was unnecessary to include the discussion under Section V of this opinion analyzing the problem of balancing the right to a fair trial versus the right to freedom of press or freedom of speech. However, these comments were made so that at least this opinion will not be considered as inferring that if plaintiff could have, under the *Doggett* rationale, established that "the information was prejudicial and the dissemination widespread in the community" [12] that plaintiff has any automatic claim under 42 U.S.C. § 1983. Again, I re-emphasize that upon the facts of this record plaintiff has not established any prejudice or deprivation of his constitutional right to a fair and impartial jury trial in his criminal case. Thus, it is unnecessary to make any ultimate judgment [13] of where the constitutional balancing line must be drawn between freedom of speech or freedom of the press and the right to a fair trial.

12. Doggett, *supra*, 472 F.2d at 238.

13. If the Court of Appeals rules that I should have made an ultimate judgment on this balancing process, I would find that on the facts of this case, even though there is a conspiracy count, the reporter, Doris Wiley, is immune from civil liability. *See* New York Times Co. v. Sullivan, *supra*. *Cf.* Rosenbloom v. Metromedia, Inc., *supra*; Gordon v. Random House, Inc., 486 F.2d 1356 (3d Cir. 1973). As to the prosecutor, Richard A. Sprague, the Court of Appeals has used recent language which might imply a total immunity. For in Johnson v. Alldredge, *supra*, 488 F.2d at p. 1267, the Court said: ". . . that state prosecutors are immune from damage actions brought under section 1983." In Bauers v. Heisel, 361 F.2d 581 (3d Cir. 1965) cited in Johnson, *supra*, when speaking of prosecutorial immunity, the Court held:
"The immunity of a prosecutor, however, is not without limitation; it is not absolute . . . . Because immunity is conferred on an individual solely by virtue of the office he holds, reason requires us to adopt a rule which does not provide immunity for those acts which are done *clearly outside the authority or jurisdiction of the office*." 361 F.2d at 590, 591 (Emphasis added).
If the Court of Appeals is still following the Bauers rationale, I would hold that Richard Sprague is nevertheless immune, since the acts alleged were not "clearly outside the authority or jurisdiction of the office."