**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Harold PORTER, Defendant-Appellant.
No. 17264.**

United States Court of Appeals
Sixth Circuit.

Dec. 7, 1967.

The evidence fairly established that for the year 1962, persons using the names of Jackson and Erwin filed short form 1040A income tax returns dated April 13, 1963; the Jackson return claimed a refund due of $628.26 and that of Erwin, $615.20. Attached to each return was a W-2 form exhibiting the name of the claimed taxpayer's alleged employer. Checks for the respective amounts, stamp dated as issued on April 30, 1963, were mailed to the given addresses of Jackson and Erwin. These checks and the 1040A returns were introduced in evidence; each check bore a purported endorsement by the payee and each was then endorsed by Harold Porter, who collected the proceeds therefrom by cashing one of them at a bank in which he maintained an account and depositing the other in such account.

The two checks here involved were among some 14 checks discovered by Internal Revenue Inspectors to have been issued on fraudulent returns. Investigation disclosed that there were no such persons as Jackson and Erwin living at the addresses given on the returns, but that friends of appellant did reside there; the social security numbers were spurious, and neither a Charles Jackson nor a James T. Erwin had been employed during the year 1962 by the concerns set out in the W-2 forms.

Porter's testimony in his own defense is characterized in his brief as follows:

"Porter testified that these two checks were presented to him by two different persons representing themselves as payees thereon, each in the company of a third party named William Huff. Defendant stated he cashed the checks in one instance in order to facilitate settlement of a $100 debt owed defendant by Huff and in the other instance in order to receive his payment of $135 due on a bill for repairs performed on the second payee's car at the defendant's auto body repair shop. In both cases the checks were for approximately $600. Defendant, Porter, asserted he handed the balance on each check over to the payees."

Edward R. Brown, Cleveland, Ohio, for appellant, Robert G. Tunnell, Jr., Cleveland, Ohio, on the brief.

Robert J. Rotatori, Asst. U. S. Atty., Cleveland, Ohio, for appellee, Merle M. McCurdy, U. S. Atty., Cleveland, Ohio, on the brief.

Before O'SULLIVAN and PHILLIPS, Circuit Judges, and CECIL, Senior Circuit Judge.

O'SULLIVAN, Circuit Judge.

Defendant-appellant, Harold Porter, appeals from conviction, upon jury trial, on both counts of a two count indictment. The first count charged that:

"On or about the 3rd day of May, 1963, in the Eastern Division of the Northern District of Ohio, HAROLD PORTER did receive, conceal and retain with intent to convert to his own use or gain a thing of value of the United States, to wit: U. S. Treasury Check No. 50,895,418 issued April 30, 1963 at Kansas City, Missouri, in the amount of $628.26 payable to CHARLES JACKSON, 2276 East 93rd Street, Cleveland, Ohio, knowing said check to be a thing of value of the United States, and knowing it to have been embezzled, stolen, purloined or converted; all in violation of Title 18, Section 641, United States Code."

Count II described a like offense occurring on May 8, 1963, involving a check payable to James T. Erwin in the amount of $615.20.

Porter ascribed the circumstance that friends of his resided at the addresses used in the spurious tax returns to coincidence. He said that Huff was a friend of his; that he had Jackson exhibit a driver's license as identification, but that Erwin provided no identification other than his introduction by Huff; that he had never seen the apparent imposters who brought the checks to him, either before the incident or since. Huff did not appear at trial. According to appellant's brief:

"The purported third-party intermediary, Mr. William Huff, who presented the individual payees to the defendant for endorsement of their checks, was not produced at trial, although defendant's former lawyer had interviewed him but had difficulty relocating him."

No claim is made that the evidence was insufficient to warrant conviction; rather, appellant seeks a new trial on the grounds, First, that he was prejudiced by remarks made by the Court within the hearing of one or more of the jury, in the course of sentencing in a related case, and, Second, that the District Judge's comments on the evidence, made during the instruction of the jury, were grossly prejudicial and exceeded permissible discretion.

### 1. Trial judge's remarks in related case.

The government's evidence had disclosed that the two treasury checks involved in this case were among some 14 refund checks under investigation by the Internal Revenue Service. Other indictments had come out of this investigation. On the morning of the day in which the District Judge charged the jury in this case, he passed sentence on another man who had pleaded guilty to one of such indictments. In passing sentence on this man, Ira S. Pittman, the District Judge said:

"Mr. Pittman, you handled four of these checks that were issued out of the United States Internal Revenue Service Department by some lady who was very crooked and dishonest, and

you got four of these checks, and I don't think anybody in that deal got any of these checks unless it was prearranged. Somebody on the inside passed money to somebody on the outside. They passed it out so they get back their cut; and out of these 14 checks you had 4.

"You are sentenced to two years in the custody of the Attorney General. "* * * [other comment by defense attorney and judge omitted]. He had no business taking four of the $500 checks that come out of the Internal Revenue Service; so that is that. Let's have the next, please."

Upon resumption of the trial of the case at bar, appellant's counsel moved for a mistrial, asserting that one or more of the jurors in this case (juror 5 or juror 6) was present in the courtroom when the above quoted remarks were made, and that irremediable prejudice was the necessary result. No inquiry was made of the jurors who might have heard the remarks, nor was there any request for such inquiry. The motion was denied. Afterwards, in his charge to the jury, the District Judge gave this cautionary instruction:

"It has been mentioned to me that during our busy morning some of you jurors may have gotten into the courtroom. I do not know whether that is so or not, because it was so crowded I couldn't see. But I must respectfully suggest that if anyone did, do not let any impression anybody got in the courtroom affect your thinking in this lawsuit. We had this morning what we call the arraignments where we have to ask everybody how they plead, and then we had sentences involving cases in which we have reports on those who have in the past either pled guilty or been found guilty. If anything was said that leaves an impression in your minds, wipe it out, any impression of any kind, because you are to judge this case solely and only on the sworn evidence in this case, and, therefore, you should have nothing else on your mind."

It is contended that any juror who heard the quoted sentencing proceeding would have construed the Court's comments as indicating his belief that anyone involved with the fourteen checks was part of a "crooked and dishonest" transaction, a "prearranged deal." Such is not an unreasonable conclusion. Were we to review the occurrence in isolation, it would be necessary to consider the procedural adequacy of appellant's motion for mistrial and the substantiality of the error assigned. But since, for the reasons which follow, we reverse on other grounds, we need not pass on the question presented; the incident will not recur at another trial.

### 2. The judge's comments on the evidence.

Appellant argues that during his charge the District Judge went beyond permissible limits in his comments on the evidence. He gave correct instructions on general matters such as the burden of proof, reasonable doubt, and credibility. Several times he emphasized the jury's prerogatives as the fact finders; he told them they should disregard his recitals of the evidence if his memory of it conflicted with their own recollections. Interspersed among sound statements of relevant law were the following comments and admonitions:[1]

"Why is it, as an observation on human nature, that every time there is a fund lying loose owned by the public, someone in a trusted position so often tries to figure out how to get that money out of that till and out of the company's register into the hands of somebody who has no right to it at all, either by embezzling it himself, or by some subterfuge which gets the money out of the building? Why is that?

"Here we have a situation where there is no question about the thievery that went on in some Federal office. No question."

\*    \*    \*    \*    \*    \*

"So here is somebody in some department of this Government, in the interior of the Federal system, Internal Revenue Service system notices that refund checks that are mailed out to the people that ought to get them are coming back, and they pile up and nobody claims them. Now, of course, if any of those people ever come in at a later time and says 'I want my money,' the Government has to give it to them. The fact that these 14 checks went out wouldn't let the Government out of paying the right people, if they show up, if, as and when they show up, and they can show up any time they want to show up. Nobody can control that.

"So here it piles up and someone on the inside figures out, in the back of their head, how do we get this out of here? How can we get our hands on this money? How do we get it out? Here are the refunds, these people haven't taken it, we have mailed it to them a number of times, and they don't take it. How are we going to get it out?"

\*    \*    \*    \*    \*    \*

"I have told you you shouldn't talk about the case during these days of trial, but I hope you have been thinking, we know you have been thinking and have been saying to yourselves, 'How did they get it out? What is the procedure for getting it out?' How do we get this money out of the United States till and out to someone on the street who will stick it in his pocket? Oh, no, not entirely, because the per-

---

1. The trial judge's remarks which we quote suggest that he was of the opinion that someone in the Internal Revenue Department was a party to the dishonest scheme, and that he or she had to depend on the party who finally cashed the checks for a share of the stolen money. From our reading of the testimony and examination of the exhibits, we consider that it could be inferred that the spurious income tax returns, which called for refunds, were accepted at face value by the Internal Revenue Service, and refund checks issued in the regular processing of the returns without any fraudulent participation by a government employee.

son, whether it is a man or a woman, and whoever it is has not been brought out to you, because that isn't part of your case, that person, whoever that person was who wants to embezzle this and get it out of his or her custody, that person has to be paid, too, haven't they? How are we going to get the money out of the building that the United States Government has put up to house its people and its money, and into the hands of someone on the street who will pay off the person who issued the checks? Isn't that the only game that the person would play who has figured out a way of getting that money out of our till? So how do we do that?"

\*      \*      \*      \*      \*      \*

"And when the check is issued, what is in the mind of the issuer? Why, in the mind of the issuer, they want whatever share they are going to get for inventing this plan and sending out the money that belongs to the Government and not to them, sending out the money that they expected to be reimbursed by.

"Isn't that human nature? Ask yourselves. I said you have to ask yourselves some questions, and you have to think and think. You almost have to put yourself in the place of the crook and figure out, now, how would a crook do this? And you have been thinking. What conclusions do you arrive at? How would it be done? How should it be done? What is the smartest way of doing it, because somebody has to take a chance?

"Well, we know that money comes in, which is unclaimed. Now, someone who has authority to issue checks then must proceed to issue the checks, and you have heard here from the mouth of one of these witnesses that 14 checks were issued."

\*      \*      \*      \*      \*      \*

"So how would the brains that conceived this plan figure out, 'How can I get this money out on the street so I can get it back into my wallet? How can I get it out of this building, in which I work, so that ultimately I will get my share?

"So the Government money was on the inside, somebody wanted to get it on the outside, and they wanted to make a success of the theft, of course. And I ask you to ask yourselves, would that person do that for any other purpose other than to get his or her share or cut or division out of the dishonest check that he or she issued here?

"So the next question is, well, how do we issue it? Somebody has to take a little chance, don't they? Someone has to get ahold of the piece of paper and take it to a bank and lay it down and pretend its his. Well, maybe the way that was figured out by the one who did this stealing was not perfect, but can you figure any better way, since they must make the thievery complete, and must get the money out of the Federal Building into the pocket of somebody who will then be willing to pay back its beneficiary, its donor, the person who issued the check in the first place? And you must ask yourselves, would that check issuer issue it to anyone it didn't know? Would it issue a check to anyone of whom it wasn't sure?"

\*      \*      \*      \*      \*      \*

"This is no child's play. This is as serious as things get. This is Government money to which you make your contribution, everybody does. Somebody figured a way to steal it. And the law we have just read says that should be stopped, and I told you what the law is, and you are to apply it however you come to your decision. Whichever way. So the first thing you have to ask yourselves is, and I have said you must think and think and think, what was the only manner in which the fabricator of this scheme to defraud the Government could get his or her cut out of this money?

Would he or she get it from a fictitious person to whom the checks were payable? Hardly, because a fictitious person isn't a person, is it? It is a name on paper which to some degree might take the heat off somebody, but ultimately somebody has to walk in that bank and lay down that check. Would he get it in a fictitious person, or would he get it in the last person endorsing the check who actually got the money from the check? Ask yourselves that. Who first handled cash here? Oh, there were a lot of motions, a lot of going back and forth, lots of discussions. Who actually was the person to handle money? And nowhere else could the brains behind this scheme get a profit out of this scheme except through the handler of that cash. Don't you think so? You have got to think and think."

* * * * * *

"The Government said two of these checks got into this Defendant's hands, and the Government has offered evidence of how each got to an address of people known to the Defendant in each instance, in each case with reference to each. Just happened to get to houses where he was acquainted with the people who lived in the house. That is their claim, and you have heard the evidence on that question."

* * * * * *

"So we have this situation wherein you, coming down to the wire, must make a decision, your ultimate question always being the one which I have said. The Defendant here says he got these checks which were issued to these two fictitious people, Jackson and Erwin, through one Huff. Of course, nobody can find Erwin or Jackson, as I have said. You must ask yourselves, is it or is it not a strange coincidence that out of two million people in this county, this Defendant gets his hands on two checks out of these 14. You must ask yourselves what is the human nature behind this. Would it be human nature to issue the check and not be sure that one gets his cut at the end of the line when somebody cashes the check? Is it human nature just to cash people's checks for $600, really, knowing nothing as to who is handling it; knowing nothing as to whence they come and for what purpose?"

■■■ Adequate objection was made to the charge. We have set out the judge's comments at the above length to portray their volume and repetitive emphasis. Aware that the federal view permits some comment on the evidence, Quercia v. United States, 289 U.S. 466, 469, 53 S.Ct. 698, 77 L.Ed. 1321 (1933), we construe the above quoted excerpts as going beyond permissible limits. The judge's discussion of the government's evidence could easily be construed as an expression of his belief that the defendant was guilty. It can be said that here "the judge was exhibiting a prosecutor's zeal, inconsistent with that detachment and aloofness which courts have again and again demanded, particularly in criminal trials." United States v. Marzano, 149 F.2d 923, 926 (2d Cir. 1945). In Buchanan v. United States, 244 F.2d 916, 920 (6 Cir. 1957) we said:

"The court cannot direct a verdict of guilty in criminal cases, even if the facts are undisputed. Dillon v. United States, 2 Cir., 279 F. 639. It cannot do indirectly what it cannot do directly, and by its instructions in effect advocate such a verdict of guilty. Weare v. United States, 8 Cir., 1 F.2d 617. Where the trial judge undertakes to sum up and comment on the evidence, and his comments are in the nature of an argument to the jury, he thus assumes the role of an advocate; and this is error, as established by repeated decisions. Minner v. United States, 10 Cir., 57 F.2d 506."

A good statement of the limitations on the relevant rule is contained in Judge Prettyman's decision in Billeci v. United

States, 87 U.S.App.D.C. 274, 184 F.2d 394, 402, 403, 24 A.L.R.2d 881 (1950):

"A federal trial judge in a criminal case is not an inert figure. He is not a mere moderator. Besides his own exclusive functions of conducting the trial and declaring the applicable law, he may guide and assist the jury in its consideration of the evidence. The purpose of his comment is to aid, through his experience, the inexperienced laymen in the box in finding the truth in the confusing conflicts of contradictory evidence. In exceptional cases he may even express his opinion upon the evidence, or phases of it. But there is a constitutional line across which he cannot go. The accused has a right to a trial by the jury. That means that his guilt or innocence must be decided by twelve laymen and not by the one judge. A judge cannot impinge upon that right any more than he can destroy it. He cannot press upon the jury the weight of his influence any more than he can eliminate the jury altogether. It is for this reason that courts have held time and again that a trial judge cannot be argumentative in his comments; he cannot be an advocate; he cannot urge his own view of the guilt or innocence of the accused."

We do not consider it an effectual remedy that the District Judge admonished the jury that they were the sole judges of the facts and were not to be controlled in that function by what the Court said. The volume of the judge's "argument" would, in this case, submerge such "boiler plate" observations. See Frantz v. United States, 62 F.2d 737, 739–740 (6th Cir. 1933); Sandals v. United States, 213 F. 569, 576 (6th Cir. 1914).

It seems probable that a conviction of Porter would have been obtained unaided by the District Judge's advocacy. It is to be regretted, therefore, that law enforcement is pro tanto frustrated by our need to reverse.

Reversed and new trial ordered.