**UNITED STATES of America**

**v.**

**Michael Stanley GREEN.**

**Crim. No. 72–425.**

United States District Court,
E. D. Pennsylvania.

March 8, 1974.

J. Clayton Undercofler, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

C. Clark Hodgson, Jr., Philadelphia, Pa., for defendant.

## OPINION

DITTER, District Judge.

This case comes before the court on the post trial motions of a defendant convicted of air piracy despite his insanity plea.

Through testimony and exhibits, the following uncontroverted facts were established. The defendant, Michael Stanley Green, and another man, who was referred to during the trial as Lulseged Tesfa, boarded National Airlines Flight 496 on July 12, 1972, in Philadelphia, Pennsylvania. The plane, which had come from Jacksonville, Florida, and was scheduled to land in New York, left Philadelphia at 6:40 P.M. with a crew of seven and 113 passengers. As the aircraft approached New York's Kennedy airport, the defendant and Tesfa drew weapons, putting a shotgun against the head of one stewardess and a pistol against the head of another. Sitting with their fingers on the triggers, the skyjackers sent previously-prepared typewritten notes to the pilot. They demanded $600,000, and three parachutes, warning that they had a bomb which would explode in 90 minutes. The hijackers wanted their ultimatum met in Philadelphia. The plane therefore headed back to Philadelphia and circled the airport waiting until the money and parachutes could be obtained. Since the aircraft was running low on fuel, the pilot landed just after 9 P.M. contrary to

the skyjackers' orders. At 9:30 P.M. the skyjackers ordered the crew to take off. Instead the pilot taxied the aircraft a short distance and then jumped from a cockpit window as the plane ran out of fuel. He was badly hurt by his fall to the ground, but escaped.

The rest of the crew and the passengers were held captive by the defendant and his companion while prolonged negotiations took place with the FBI. Because the aircraft had no gas, there was no power to operate the airconditioning. Inasmuch as the skyjackers refused to allow a door or window to be opened the temperature inside the plane rose to well above 100 degrees causing great discomfort to the crew and illness to several passengers. Various members of the crew had cocked guns held at their heads throughout the night. Early on the morning of July 13, the skyjackers tied the crew members' hands behind their backs and left the airplane. Surrounding themselves with the crew as a protective shield, the skyjackers transferred to another National Airlines aircraft, Plane No. 42, on which $500,000 and three parachutes had been placed. The passengers were permitted to remain on the first aircraft. While Mr. Green was searching the new plane for hidden weapons and FBI agents, his pistol accidentally went off, wounding the flight engineer in the leg. At 5 A.M. the second aircraft took off and headed south in accordance with Tesfa's orders. Later that morning as they approached the Gulf of Mexico, the skyjackers ordered the plane to fly to Jamaica. The copilot, realizing he did not have enough fuel, slammed shut the cockpit door and initiated a series of maneuvers which alternately threw the skyjackers against the cabin ceiling and floor. Finally, he landed on a small field in Texas and together with the flight engineer, escaped through a cockpit window. The four stewardesses remained in the plane with the skyjackers, who surrendered to the FBI late on the afternoon of July 13 after extended negotiations.

## MOTION FOR JUDGMENT OF ACQUITTAL

The main issue raised at the trial was the criminal responsibility of the defendant. He contended that he had total amnesia as to the skyjacking, the events that immediately preceded it, or anything that happened for some days thereafter. His experts testified this amnesia was a symptom of brain damage and a psychoneurotic condition which would have warranted a not guilty verdict had it been accepted by the jury. Mr. Green initially asserts that the evidence against him was insufficient to show he was sane and therefore to support the verdict.

██ It is well established that once the defendant raises the issue of mental capacity, the Government has the burden of proving sanity beyond a reasonable doubt. United States v. Currens, 290 F.2d 751, 761 (3rd Cir. 1961); Berry v. United States, 286 F.Supp. 816, 818 (E. D.Pa.1968), rev'd on other grounds, 412 F.2d 189 (3rd Cir. 1969). The defendant contends the verdict was against the weight of the evidence. He had one neurologist, a clinical psychologist, and three psychiatrists as his expert witnesses. The Government, in rebuttal, called one neurologist, one psychologist and one psychiatrist as its expert witnesses. This was a classic battle of experts.

The law is clear that the issue of sanity is one for the jury or trier of fact to decide. United States v. Currens, 290 F.2d 751, 762–763 (3d Cir. 1961). See United States v. Green, 150 U.S.App.D. C. 222, 463 F.2d 1313, 1316 (D.C.Cir. 1972); United States v. Handy, 454 F. 2d 885, 888 (9th Cir.), cert. denied, 409 U.S. 846, 93 S.Ct. 49, 34 L.Ed.2d 86 (1972); United States v. Archer, 450 F.2d 1106, 1108 (8th Cir. 1971), cert. denied, 405 U.S. 1044, 92 S.Ct. 1329, 31 L.Ed.2d 586 (1972); Apgar v. United States, 440 F.2d 733, 737 (8th Cir. 1971); United States v. Hernandez, 438 F.2d 676, 678 (5th Cir.), cert. denied,

402 U.S. 976, 91 S.Ct. 1679, 29 L.Ed.2d 141 (1971). See also Pritchard v. Liggett & Myers Tobacco Co., 295 F.2d 292, 296 (3d Cir. 1961). The number or expertise of the witnesses is not determinative per se; rather it is the quality and credibility of their testimony which must be weighed. No one, in our system of justice, is in a better position to do this than the jury.

The Ninth Circuit has held:

The fact that the defense had more experts to testify than the plaintiff had, is not of controlling importance. The weight of the evidence is not determined by the number of witnesses who testify for either side, but by the quality of their testimony. The credibility of experts is to be determined by the jury, not by the court.

United States v. Handy, supra at 888. It has even been held that the Government could meet its burden of proving sanity without expert medical testimony. See United States v. Pitts, 428 F.2d 534, 536 (5th Cir.), cert. denied, 400 U.S. 910, 91 S.Ct. 154, 27 L. Ed.2d 149 (1970). In this case we do not need to reach that question.

■ Viewing the evidence in a light most favorable to the Government, it is clear there was substantial evidence by which the jury could find the defendant sane beyond a reasonable doubt.

## MOTION FOR A NEW TRIAL

■ 1. *Motion to transfer the trial.* Defendant contends that the court erred in denying his pre-trial motion, under F.R.Cr.P. 21, to transfer the case to Washington, D.C. He based his motion on two grounds. First, the defendant asserted he could not get a fair trial in Philadelphia because of local prejudicial pre-trial publicity concerning the skyjacking. Second, the defendant claimed the motion should have been granted for the convenience of his witnesses.

Considering pre-trial publicity in Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), the Supreme Court held that a defendant must be protected from massive, pervasive and prejudicial news coverage which prevents a fair trial. A trial court can continue the case until a later date or transfer it to prevent prejudice to the defendant. *Id.* at 363, 86 S.Ct. at 1522.

During and shortly after the skyjacking the press, radio and television gave it considerable publicity. There is no reason, however, to suspect that these stories had any effect on the jurors. The trial started more than ten months after the skyjacking and in the meantime, the media reported additional skyjackings that took place in other parts of the country and around the world. Nevertheless, the voir dire showed there was no prejudice to Green by reason of the coverage relating to the incident in which he was involved or that which attended any other.

When Green's motion to transfer was denied, the court stated that after the voir dire had started it would reconsider the motion if the questioning of veniremen indicated they remembered the pretrial publicity. It soon became evident that most of them did not.

The voir dire itself was neither simple nor perfunctory. It took three full days to choose the jury. There was a serious and comprehensive examination of the potential jurors to determine if any could remember or had had contact, direct or indirect, with the facts or publicity surrounding this case that would in any way suggest a likelihood of prejudice. See American Bar Association Project on Minimum Standards for Criminal Justice, Standards Relating to Fair Trial and Free Speech 3.2(c). Each group of prospective jurors was asked 13 general questions about their experiences, backgrounds, and knowledge of the skyjacking. They were then asked to answer yes or no to a series of twenty-five specific questions designed to reveal those who might have had direct or indirect contact with the incident or the organizations affected. The group was then excused and each potential juror was questioned individually

and extensively by the court concerning any affirmative answers previously given and as to his recollection of the skyjacking and publicity resulting from it. In this part of the examination, there were 23 questions (plus those prompted by previous affirmative responses), 12 of them being devoted to inquiring whether there was any possible memory of the skyjacking or the publicity surrounding it, which could possibly influence the veniremen's views. If someone did remember something, no matter how insignificant, the court made further inquiries to reveal the full extent of that recollection. The remaining questions dealt with the nature of the defense and possible bias. No effort was spared to uncover recollection and prejudice, whether created by the pre-trial publicity or not. The Court freely asked the veniremen any question either attorney requested. The questions and techniques had all been prepared by the trial judge and counsel with the principles of United States ex rel. Doggett v. Yeager, 472 F.2d 229 (3rd Cir. 1972) in mind.

A review of the voir dire clearly reveals that the jurors were not prejudiced by the pre-trial publicity because they simply did not recall the hijacking. Their memory of the incident and its details was insufficient to affect consciously or unconsciously any finding they made. (N.T. 307–09, 377–79, 415–19) Therefore, the defendant's contention is without merit. See United States v. Farries, 459 F.2d 1057, 1060–1061 (3rd Cir.), cert. denied, 409 U.S. 888, 93 S.Ct. 143, 34 L.Ed. 145 (1972); Tasby v. United States, 451 F.2d 394, 397 (8th Cir. 1971), cert. denied, 406 U.S. 922, 92 S.Ct. 1787, 32 L.Ed.2d 122 (1972); United States v. Barber, 442 F.2d 517, 528–529 (3rd Cir.), cert. denied, 404 U.S. 958, 92 S.Ct. 327, 30 L.Ed.2d 275 (1971). It is worthy of note

that the defendant did not use all of his peremptory challenges and at the close of the second day of jury selection, the defendant's counsel remarked that he had had less of a problem in selecting the jury than he had expected. (N.T. 357)

The defendant relies, however, more heavily on the contention that his witnesses were inconvenienced because the trial was held in Philadelphia. F.R.Cr.P. 21(b). He admits that denial of the pre-trial motion to transfer did not result in the unavailability of any defense witness. Instead, he claims that it caused an inability to get them to court on time. Mr. Green alleges this delay, coupled with the longer hours the court sat during the last days of the trial, was in some nebulous manner prejudicial to him by affecting the jury's attention span.[1] However, there is no contention that any potential witness was kept from testifying or that any aspersion was cast on defendant or his counsel because witnesses were not available. In addition, there was no proof that the same delays might not have taken place if the trial had been transferred.

The Supreme Court in Platt v. Minnesota Mining & Manuf. Co., 376 U.S. 240, 243–244, 84 S.Ct. 769, 771, 11 L.Ed.2d 674 (1964), said that location of possible witnesses is one of ten factors to be taken into consideration by the court in ruling on a Rule 21(b) motion. It is widely recognized that the trial court has broad discretion in this matter. 2 C. Wright, Federal Practice and Procedure § 344, at 637 (1969). See United States v. Phillips, 433 F.2d 1364, 1368 (8th Cir. 1970), cert. denied, 401 U.S. 917, 91 S.Ct. 900, 27 L.Ed.2d 819 (1971); Jones v. Gasah, 131 U.S.App. D.C. 254, 404 F.2d 1231, 1242 (D.C.Cir. 1967), cert. denied, 390 U.S. 1029, 88 S.Ct. 1414, 20 L.Ed.2d 286 (1968); United

---

1. The complaint is not justified. During the presentation of defense witnesses, court was adjourned at noon, 4:40 P.M., 4:35 P.M., 5:00 P.M., 4:35 P.M., and 5:40 P.M. The record for June 6 does not indicate the time for adjournment, but court did not commence that day until 2:00 P.M. During the presentation of prosecution witnesses, court was adjourned at 4:35 P.M., 4:15 P.M., 4:35 P.M., 4:20 P.M., 4:45 P.M., 5:30 P.M., 4:30 P.M., and 5:00 P.M.

States v. Jessup, 38 F.R.D. 42, 45 (M.D. Tenn.1965); United States v. Cohen, 35 F.R.D. 227, 231 (N.D.Cal.1964). It will always be true that any trial will result in some inconvenience to both parties, Jones v. Gasah, supra at 1241, so that the defendant must show substantial inconvenience or his motion will be denied. See United States v. Cohen, supra at 232.

To a great extent, both sides relied on lay witnesses who were residents of other states. Most of the defendant's witnesses lived in the District of Columbia, only an hour and a half away by train, while most of the Government's witnesses lived at greater distances. Despite the supposed inability of the defense witnesses to come to Philadelphia, all of them appeared and several of them, members of the Green family, having testified, returned on ensuing days as spectators. (N.T. 2185) An important witness for the defendant, his wife, was temporarily staying in North Carolina. Since the prosecution cooperated in making arrangements for her transportation, it was just as easy for her to come to Philadelphia as it would have been to go to the District of Columbia. ·

■■■ Weighing the alleged inconvenience against the Constitutional requirement that trials be held in the state where the offense took place, I conclude that the defendant was not entitled to a transfer of venue and his motion to transfer was properly denied.

## 2. *Cross-Examination of Defendant*

One of the principal issues at trial was the defendant's credibility: was he telling the truth when he said he had no memory of the hijacking? Green argues that the Government improperly asked him a series of questions during cross-examination which required an opinion or a speculative answer. In general, these questions dealt with his thought processes and were related to methods that might be employed in the hijacking of an aircraft. The questions were based on evidence already received as to Green's activities and those of his companion. He was asked, for example, whether placing a gun in a hollowed out book would be a good way to conceal such a weapon. To this and to most of the questions of a similar type, the defendant replied that he did not know.

■■■ Wide latitude should be allowed in the cross-examination of an accused. In general, he may be asked about any matters pertinent or material to the issues in the case. Questioning may be searching and broad. United States v. Lowe, 234 F.2d 919, 922 (3rd Cir.), cert. denied, 352 U.S. 838, 77 S.Ct. 59, 1 L.Ed.2d 56 (1956). An accused may be cross-examined as to any fact, the existence of which renders probable or improbable the main fact sought to be proved, or for the sake of testing the truth of evidence given by him on his direct examination, or to refute his contentions. See United States v. Hykel, 461 F.2d 721, 728 (3rd Cir. 1972).

The purpose of this line of questioning was to establish that the actions of the hijackers during the events in question were reasonable, well-planned, and carefully calculated to afford the maximum opportunity for success. This crime was not one of sudden impulse. To the contrary, its details had been thought out, the necessary weapons and their means of concealment obtained and prepared, and it was executed by two men who had been intimately acquainted for many months. They acted deliberately and logically. They communicated with each other and with crew members and passengers without difficulty. After the escape of the flight engineer and co-pilot in Texas, the hijackers discussed in a rational way the options that were still available to them. When they finally surrendered, they made sure it would be to federal authorities and that they would be returned to Philadelphia. Green and the stewardesses talked about sports and family matters, and it was

Green who interceded when his companion wanted to kill one of the stewardesses.

■ Here the principal fact in issue was contained within the hidden recesses of the defendant's mind. He maintained he had no memory of the events in question and that at the time of the hijacking he lacked the mental capacity to be held responsible. The opinions of the experts who supported him depended upon the truth of his asserted amnesia. Therefore, how his mind worked, the logic of his answers, whether he was forthright or evasive, and how he responded to challenging and stressful questions were directed to the only facts in issue: his credibility and his mental capacity. In brief, any questions designed to reveal the defendant's mental processes were germane. As it is pointed out in United States v. Currens, 290 F.2d 751, 772 (3rd Cir. 1961), all the defendant's relevant symptomatology must be brought before the court and fully explained. The entire picture of the defendant must be presented.

As Green's psychiatric defense unfolded, his experts testified that normal behavior would be completely consistent with the psychoneurosis they observed and explained his inability to answer the government's questions on the basis that he could not think abstractly and generalize or put himself in the place of someone else. Therefore, it developed that the defendant's performance on this phase of cross-examination · was completely consistent with the remainder of his proffered defense and was in no way prejudicial to him.

### 3. *Denial of Mistrial*

The defense contends it was error to refuse a mistrial when one of the stewardesses began to cry and left the courtroom while the defendant was testifying. It is further asserted that cautionary instructions to the jury concerning this incident were ineffective because one of the jurors spoke to the stewardess that afternoon.

Linda Joiner had been a witness for the government. While the defendant · was testifying several days later, Miss Joiner's presence was noted in the spectator's section of the courtroom. (N.T. 1885) Defense counsel suggested that perhaps some sort of a "psychiatric experiment" was being planned. He said he would object to her presence if this was the case. He also said that if Miss Joiner was there as a spectator, or if she was there to "listen to what he [Green] says and in turn to tell Mr. Undercofler [the government's attorney] her impressions of what he says, if he talks the same now as he talked when he was on the plane" there was no objection. (N.T. 1886) The next morning while Miss Joiner was seated within the bar of the court, she suddenly rose and hurried from the room. When she was approximately ten yards from the door, she began to cry. The entire incident took less than ten seconds, was neither loud nor dramatic, and came without warning. It occurred when defense counsel handed to defendant the gun he used during the ·: hijacking.[2] Defendant

---

2. I stated my observations of what occurred as follows:

"The only thing I wanted to say was that the entire incident, I would think, took somewhat less than 10 seconds, if it took that long, at least so far as my hearing of the incident was concerned. I was not looking at Miss Joiner at the time that the incident started. I became aware of it when I heard what sounded to be a muffled cry and by the time I looked up she was disappearing out the door and the point from where she was sitting to the door I would think is approximately 20 yards, maybe as much as 22 yards, but not very far.

'And I was told by my Court Reporter that she did not begin to cry until she was at about the second or fourth spectator row. She was approximately halfway out before there was any noise at all from her."

. . .

Mr. Hodgson [defense counsel]: And it was a loud noise.

The Court: And it was not a loud wailing nor was it a shrieking, it was the sound of somebody sobbing.

moved for a mistrial. A recess was immediately taken and before testimony was resumed, the jury was reminded that the case was to be tried on the basis of the law and the evidence, and that feelings of sympathy or prejudice should be laid aside. The jurors were instructed that whatever they may have seen or heard was not to have any part in their deliberations. They were then asked if there were any who felt he or she could not follow these instructions. None responded in the affirmative. (N.T. 1982–83)

The next court day, an agent of the FBI related to counsel and me that Miss Joiner had telephoned him to report that one of the women jurors had approached her and after asking if she was all right had said, "Well, don't worry, we understand." The juror then added something to the effect that it was a "low" thing that would take a while to get over. (N.T. 2181–82) Counsel and I agreed that Miss Joiner had probably described Juror No. 4, Mary Plattowski, (N.T. 2183). The jurors were immediately questioned individually about such a conversation. Each denied having any knowledge concerning it. (N.T. 2149–2180) Defense counsel was then given an opportunity to ask that Mrs. Plattowski, or any other juror be excused and replaced with an alternate juror. (N.T. 2185) Counsel indicated, however, he was content to have Mrs. Plattowski remain. (N.T. 2686) There was no motion for a mistrial. The opportunity to have Mrs. Plattowski excused was again extended to counsel on the record (N.T. 2688) as it had been off the record right along. Since Mrs. Plattowski was scheduled to attend a real estate settlement during one of the days of trial, she could have been dismissed from the jury without inviting anyone's attention to the alleged conversation with Miss Joiner. (N.T. 2689)

The assertion that a mistrial should have been granted is without merit. First of all, there was no indication of any prejudice to the defendant. There was no denial that he had done the things attributed to him by the various witnesses. The issue was whether he was criminally responsible. Miss Joiner's sudden departure from the courtroom did not create any feeling of illwill toward Green nor particular sympathy for her. It was a momentary event in a long trial. It neither added to nor subtracted from any feelings already present. Six members of the crew had testified about an ordeal that lasted approximately 20 hours during which guns were held to the head of one or more of them for most of the time. Their lives had been continuously threatened. The pilot and copilot were badly hurt when they jumped from the plane, and the flight engineer had been shot. During her direct testimony, Miss Joiner had made it very clear that she felt a considerable amount of sympathy for Mr. Green and that she credited him with having saved her life and that of one of the other stewardesses. (N.T. 1035–36) If there was any emotion in the courtroom it was not supplied by Miss Joiner's exit.

Moreover, after Miss Joiner left the room, the jury was warned promptly by the court and questioned concerning the incident. There was nothing to indicate by either the jury's appearance or by any response that the event had made any impression at all. It does not follow that the court's warning was ineffective because one of the juror's later in the day made some trivial remark to Miss Joiner during a chance encounter in a public corridor of the courthouse.

---

I would say a muffled sobbing, if I have to characterize it in any way.
Mr. Hodgson: Well, I would disagree with that characterization. I would say she was more wailing then anything else.

The Court: Certainly not wailing.
Mr. Hodgson: Not loud.
The Court: All right. (N.T. 1980–81. See also N.T. 1973–75).

There was no discussion, only a comment. There was no indication of prejudice to the defendant, only concern for the witness. Finally, this portion of the events only involved one juror, who could have been readily excused had counsel so requested. In fact, with full knowledge of what had taken place, counsel neither asked for a mistrial nor asked to have Mrs. Plattowski excused. To the contrary, he indicated he wished to have her continue to serve on the jury.

In considering the incident in its totality, I find no merit in the defendant's claim that he should have been granted a mistrial. See United States v. Bamberger, 456 F.2d 1119, 1127–1128 (3rd Cir. 1972); Helmick v. Cupp, 437 F.2d 321, 322 (9th Cir. 1971); Bailey v. United States, 410 F.2d 1209, 1214 (10th Cir. 1969); and Annot., 9 A.L.R.3d 1275 (1966). Miss Joiner's presence in the courtroom was proper,[3] the flurry attending her departure was minor, and since the prosecution was not trying to conduct some psychiatric experiment there was no fault on its part. Most important, there was no prejudice to the defendant as to the only issue at trial: his criminal responsibility.

**4.** *Defendant's hearsay testimony.* Defendant alleges that the court erred in sustaining the Government's objection to a question which asked Mr. Green to relate the out of court conversations of other individuals concerning the facts of his previous amnesic experience.

This question clearly required hearsay and self-serving testimony by the defendant with the Government having no opportunity to cross-examine those who made the out of court statements. The defendant cites no exception or case by which the testimony may be admitted and none occurs to me. The testimony was properly excluded.

**5.** *Dr. Ross' cross-examination.* Defendant claims that the court erred in allowing one of his witnesses, Dr. Mary Eleanor Ross, a clinical psychologist, to be cross-examined by the Government about the defendant's sanity. He alleges that the questioning went beyond the scope of her direct examination. A close examination of the record does not substantiate the defendant's contention.

While the scope of cross-examination is generally limited to matters raised by direct examination, the court has broad discretion to allow further cross-examination if it is relevant and in the interest of justice. United States v. Williams, 478 F.2d 369, 371 (4th Cir. 1973); United States v. Ryan, 455 F.2d 728, 733 (9th Cir. 1972). See also Rule 611(a) of the Proposed Federal Rules of Evidence.

The Government's cross-examination of Dr. Ross did not ask for her opinion concerning the defendant's sanity. Rather it dealt with the actions, memory and type of behavior a person suffering from a "dissociative reaction and primarily in the nature of a fugue state." Since this was a major contention upon which the defendant based his sanity defense, the questions were relevant, material and Dr. Ross well-qualified to answer them.

**6.** *Government psychologist's testimony.* Defendant argues that the court erred in allowing the Government psychologist, Albert Levitt, to testify with regard to the defendant's sanity. It is alleged that Mr. Levitt did not possess the necessary qualifications to be

---

3. The prosecution said that Miss Joiner had been brought to the courtroom for two reasons: so the jury would not forget her testimony and to help prepare for the government's rebuttal evidence which would go to the question of the defendant's sanity.

While the first reason may be questioned, the second cannot. There was no way the government could present evidence on sanity except in rebuttal and Miss Joiner's observations of him were important to the Government.

able to express an expert opinion about Mr. Green's sanity at the time of the crime citing *Jenkins v. United States*, 113 U.S.App.D.C. 300, 307 F.2d 637 (D.C.Cir. 1961).

In *Jenkins,* Judge Bazelon held:

"The determination of a psychologist's competence to render an expert opinion based on his findings as to the presence or absence of mental disease or defect must depend upon the nature and extent of his knowledge. . . . and that determination, after hearing, must be left in each case to the traditional discretion of the trial court subject to appellate review."

*Id.* at 645. The critical factor is the psychologist's actual experience and the probable probative value of his testimony. *Id.* at 646. Chief Justice Burger (then Circuit Judge), in a concurring opinion, stated that training and other factors, rather than academic degrees, are important in determining the admissibility of a psychologist's testimony about sanity. *Id.* at 650. See *United States v. Schappel,* 144 U.S.App.D.C. 240, 445 F.2d 716, 720 n. 11 (D.C.Cir. 1971) (Bazelon, C. J.); *United States v. Riggleman,* 411 F.2d 1190 (4th Cir. 1969); *Blunt v. United States,* 128 U.S.App.D.C. 375, 389 F.2d 545 (D.C.Cir. 1967).

Mr. Levitt is Chief Psychologist for the Philadelphia Court of Common Pleas. He holds a master's degree in psychology and lectures at Temple and Villanova Universities. His specialities are forensic and clinical psychology and he has had considerable post graduate work in these areas. For the last eleven years he has been connected with the criminal justice system in various capacities. (N.T. 2774–78, 2809–13).

■■■ The qualifications of Mr. Levitt, as brought out in examination by both counsel, are clearly sufficient to sustain the finding by the court that Mr. Levitt could testify with regard to Mr. Green's sanity.

7. *Naval medical records.* Defendant contends that the court erred in admitting all of the defendant's naval medical records expecially the portion pertaining to the defendant having contracted venereal disease.

■■■ The defendant's naval medical records were properly admitted as a business record made in the regular course of business, 28 U.S.C. § 1732. The medical record was relevant to the question of the defendant's prior mental history since it showed he had lived aboard ship and been at sea without suffering any emotional problems. *United States v. Bohle,* 445 F.2d 54, 61–66 (7th Cir. 1971).

The defendant's particular objection to the introduction of a record of his contracting venereal disease as being prejudicial comes right to the issue of his credibility. Dr. Ross, an expert witness for the defendant, testified Mr. Green told her he liked his service in the navy because of the travel to foreign countries. He said he liked to visit museums and made it a point to visit the birthplace of Hans Christian Andersen in Copenhagen. (N.T. 2261) The inference created by Mr. Green was one of his exemplary conduct as an overseas visitor thirsting for knowledge. His medical records, however, tend to prove that museums were not all Mr. Green visited and went to the issue of his credibility as a patient and a witness. (N.T. 2919)

8. *The court's charge.* Defendant claims that the court unduly influenced the jury by its summary of the expert testimony in its charge to the jury. He contends the summary was selective, incomplete and more critical of the defendant's than the Government's expert witnesses. He also alleges that the summary of the lay witness testimony was unfairly emphasized and that the court projected its own views about what actions the defendant should have taken while separated from his wife.

In a charge to a jury "the judge is not a mere moderator" but, as the determiner of questions of law is permitted to explain or comment upon the evidence, drawing the jury's attention to portions he thinks are important and even expressing opinions upon the facts. Quercia v. United States, 289 U. S. 466, 469, 53 S.Ct. 698, 699, 77 L.Ed. 1321 (1933). A judge's comments, however, cannot go beyond permissible limits and unfairly prejudice the defendant. See United States v. Porter, 386 F.2d 270, 275 (6th Cir. 1967); United States v. Chibbaro, 361 F.2d 365, 378–379 (3d Cir. 1966).

In this case, a review of the court's comments reveal they were fair and accurate. The jury was repeatedly instructed that it was the sole determiner of facts (N.T. 3019–30, 3022–23, 3024, 3039, 3044–45, 3059–60, 3061–62, 3063, 3064, 3065, and 3070), and it was to decide the weight to be given the testimony. (N.T. 3042)

Judge Forman has recently stated:

"If the judge exercises restraint in his comments, however, and makes it clear in his charge that the jury remains the sole determiner of credibility and fact, he has not overstepped the permissible limits of comment."

United States v. Gaines, 450 F.2d 186, 189 (3d Cir. 1971), cert. denied, 405 U. S. 927, 92 S.Ct. 978, 30 L.Ed.2d 801 (1972).

In addition, under F.R.Cr.P. 30 and 52(b), a court's charge may not be assigned as error unless there is an objection by a party before the jury retires to consider its verdict or the charge contains a plain error or defect affecting a substantial right. United States v. Chicarelli, 445 F.2d 1111, 1115 (3rd Cir. 1971). See 2 C. Wright, Federal Practice and Procedure § 484, at 284 (1969). An examination of the record shows no such objection by the defendant and the record contains nothing that would constitute plain error or a defect affecting the defendant's substantial rights. See United States

v. Hines, 470 F.2d 225, 229–230 (3rd Cir. 1972), cert. denied, 410 U.S. 968, 93 S.Ct. 1452, 35 L.Ed.2d 703 (1973); United States v. Heavlow, 468 F.2d 842, 844–845 (3rd Cir. 1972), cert. denied, 410 U.S. 933, 93 S.Ct. 1384, 35 L.Ed.2d 596 (1973).

For the reasons stated, I conclude that the defendant is not entitled to either a judgment of acquittal or a new trial.